THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEN-
NETH A. FISHER, Defendant-Appellant.

Second District    No. 2—94—0573

Opinion filed June 24, 1996.

G. Joseph Weller and Steven E. Wiltgen, both of State Appellate Defender's Office, of Elgin, for appellant.

David R. Akemann, State's Attorney, of St. Charles (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Anthony J. Peraica, of Chicago, for the People.

JUSTICE COLWELL delivered the opinion of the court:

Defendant, Kenneth A. Fisher, appeals his conviction of criminal sexual assault for committing an act of sexual penetration with a person whom he knew to be unable to give knowing consent. 720 ILCS 5/12—13(2) (West 1992). Fisher was found guilty following a jury trial in which it was found that Fisher had sexual relations with a 15-year-old girl who was rendered unconscious after she consumed a large quantity of alcohol. Fisher contends on appeal that (1) he was not proved guilty beyond a reasonable doubt, in that he produced rebuttal evidence which he claims shows that the victim was not unconscious and that she willingly participated in the sex act; (2) the trial court erred in instructing the jury that the definition of consent is a "freely given agreement" because that definition implies that mere impairment of the victim's faculties will suffice to show lack of ability to consent; and (3) the trial court erred in precluding itself from the proper exercise of its discretion by advising the jury before it deliberated that no requests by the jury for transcripts of testimony by the trial witnesses would be honored. We affirm.

The following facts were adduced at trial. The complainant, S.G., was spending the evening of November 28, 1992, at the home of a friend named Megan. Also present were friends named Cari and Heather. S.G., who weighs about 125 pounds, testified that she consumed approximately 15 cans of beer between 7 p.m. and midnight. Cari and Megan also were drinking beer; she was not sure if Heather drank any alcohol that evening. Around midnight, a cousin of Cari's named John called and invited the four girls to the home of John and Cari's uncle, the defendant. The four girls left Megan's home and drove to the defendant's house, arriving around 12:30 a.m. S.G. said she had another can of beer in the car along the way. Already present at the defendant's house were the defendant, another cousin named Jamie, John, and a boy named Bud. All of those present, except the defendant, ranged in age from 15 to 17; the defendant was 33 years old.

For the first hour or so after the girls' arrival, the entire group watched television in the living room, where all except Heather continued to drink beer. S.G. testified that she drank two or three

more cans of beer. She said she did not remember speaking with the defendant. At some point, Megan, Cari, John, and Bud went upstairs. S.G. testified that she "didn't want to be around anybody" and "I just wanted to fall asleep," so she went to the kitchen and lay down on a "bench," which was described as being a portion of a booth surrounding the kitchen table. She was fully clothed when she lay down.

Some time later, S.G. said she awoke to discover that the defendant was having sexual intercourse with her. She noticed that her shirt was pushed up, her bra was unhooked, and her "pants were around one of my ankles." She testified that she told the defendant to "stop" and "I told him to get off me." She said the defendant did not stop and did not get off of her. S.G. said she did not yell because "I was confused" and "[i]t didn't hit [me] like [sic] what was happening." She testified that at that point "I fell asleep or I passed out again." The next thing she remembered was that Heather had come into the room and was "yelling" at the defendant. At that point the defendant got up and S.G. dressed herself and Heather took S.G. out to the car while she went to get the other two girls in order to leave. She said her friends then took her to the police station because "I wanted to tell them what happened." Police officials summoned an ambulance, and S.G. was taken to the hospital. S.G. testified on direct examination that at no time did she ever give the defendant permission to remove any of her clothing or to engage in sexual intercourse with her. She said she did not remove her pants herself.

On cross-examination, S.G. admitted that when the girls left Megan's house, she was able to walk to the car without help, was able to get inside the defendant's house without any assistance, that no one forced her to go inside, that the defendant sat next to her on the couch in the living room when she first arrived, that she rose several times to retrieve more beer for herself from the defendant's refrigerator, and that she watched television in the living room with Jamie, Heather, and the defendant for approximately one-half hour after the other four people went upstairs. She then went into the kitchen under her own power, but did not remember the defendant coming into the room or remember having a conversation with him. She did not yell for help when she discovered him having intercourse with her, despite the fact that Heather was just a few feet away in the living room, because "I don't think it came in my mind." She stated that, after the act, she was able to get up from the floor where she had fallen off of the bench and to dress herself as she was handed pieces of her clothing by her friends.

Megan testified that S.G. had about 20 cans of beer at Megan's house before the girls went to the defendant's house. Megan described

S.G. as acting "confused" and said she "couldn't really talk in full sentences." She could not "look directly at anybody" while still at Megan's house. Upon arrival at the defendant's home, S.G. "kept saying she just wanted to leave."

Megan testified that, after she had been upstairs with John for some time, Heather came upstairs and said "he won't stop fucking her" and that Heather appeared very upset. Megan said she went downstairs and entered the kitchen in time to see the defendant "getting up" and that S.G. was lying on a bench. The defendant was in the process of pulling up his underwear as she entered. S.G. was lying flat on the bench and her head was "past the end" of the bench and was "hanging backwards." S.G. was crying, was wearing only a T-shirt, and "kept saying she wanted to leave." She described S.G. as "very drunk and very upset." Megan testified that later, as she waited for Cari to come downstairs so that they could leave, she heard the defendant say, "Am I going to go to jail for this?" On cross-examination, Megan conceded that when she was interviewed by a police officer the next day, she may not have told him that Heather had said "he won't stop fucking her" but may have instead told the officer that Heather had said "he won't stop having sex with her," although she could not remember precisely.

Heather testified she was the only one who did not drink any alcohol that evening. She described S.G. as "swaying" and "kind of bumping into me" as they prepared to leave Megan's house for the defendant's house. She said that, while the whole group was watching television, the defendant repeatedly complimented S.G. on her appearance and that S.G. seemed uncomfortable with his advances. S.G. would try to move away from the defendant and "just move kind of closer to Megan." After Cari, Megan, John, and Bud went upstairs, S.G. left the room and indicated she wanted to leave the house. Heather reminded S.G. that neither S.G. nor Heather possessed a driver's license and that they would have to wait for Cari and Megan. Heather told S.G. to just come and sit down with her in the kitchen, which S.G. then did. Heather testified that, after they talked for a short time, S.G. laid down on the bench and fell asleep. The defendant came in and asked Heather if she wanted to move S.G. upstairs. Heather declined, and the defendant then placed a blanket over S.G. Heather then returned to the living room and fell asleep on the couch. She was awakened by music. She sat up on the couch and called to the defendant in the kitchen, asking whether the music needed to be so loud, and he replied to the effect of "it's not bothering anybody." Heather then fell asleep again and was awakened a second time by "heavy breathing and banging on the wall." She went into

the kitchen and found S.G. naked except for her T-shirt and socks and with her head "flopping backwards" off the end of the bench. S.G.'s eyes were "rolling back in her head." The defendant was "on top of" S.G. under the blanket, but Heather could see that he was not wearing a shirt. The defendant was moving "up and down." S.G. made no sound. Heather asked the defendant what he was doing, to which he replied to the effect of "she wants it." Heather lifted S.G.'s head and asked if she was all right, to which S.G. gave a groggy, unintelligible reply.

Heather returned to the living room because she did not know what to do, and she thought the situation "wasn't right." She told Jamie that his uncle (the defendant) was "in there fucking" S.G. Jamie asked the defendant what was going on, and the defendant replied "she wants it." Jamie then turned over on the couch and went back to sleep. Heather summoned Cari, Megan, John, and Bud from upstairs, again telling them "he won't stop fucking her." Megan, John, and Bud went to the kitchen with Heather. By now, S.G. was awake and crying. Heather helped S.G. get dressed by handing her items of her clothing from the floor. Heather took S.G. outside to the car, while Megan went to get Cari so that they could leave. When Megan and Cari did not immediately appear, Heather went back inside to find them. As the four were finally in the car to leave, Heather asked S.G. if she wanted to go to the police, and S.G. nodded. The four then proceeded to the police station.

On cross-examination, Heather admitted that she did not see exactly what transpired between the defendant and S.G. while Heather slept in the living room and that she never heard S.G. call out for help.

Deputy Patti Bowker of the Kane County sheriff's department testified that she met S.G. at 6:30 a.m. on November 29, 1992, in the emergency room of a Barrington hospital. S.G. was crying, needed help to stand, smelled of alcohol, and had slurred speech. She considered S.G. to be intoxicated. She acknowledged that her police report did not specifically say that S.G. had slurred speech, needed help to stand, or was intoxicated; however, her report did reflect that S.G. told her she was "very drunk" and that she did not remember everything.

Cari testified on behalf of the defendant. Her version of the events was substantially similar to Heather's and S.G.'s through the time that she went upstairs with Bud. She said that at one point she came downstairs to use the bathroom and saw the defendant and S.G. lying together on the kitchen bench. She asked the defendant what was going on, to which he replied that "everything was fine." S.G.

also answered that everything was fine. After Heather ran upstairs, Cari sent John downstairs to investigate. Cari went downstairs about 15 minutes later. She found S.G. and Heather in the bathroom. S.G. was "emotional, crying, upset, embarrassed." She said that, while she believed S.G. to be too intoxicated to drive, she felt she knew what was going on around her, and Cari could understand her speech and felt her conversation was coherent. On cross-examination, Cari admitted that she did not want the defendant to get into trouble because he is her uncle. She did not recall telling Officer Bowker that S.G. was uncomfortable with the defendant or that she observed S.G. lying in a corner of the kitchen crying, with the defendant nearby clad in only his underwear. She also denied having told the deputy that the defendant told her she "had better talk to" S.G. or he would lose (custody of) his daughter.

John also testified for the defendant. He said that he went downstairs after Heather came up and found S.G. and the defendant lying together. He asked if everything was all right, and S.G. said everything was fine. He went back upstairs, but returned to the kitchen with Megan a second time and found "they were all [in an] uproar," and S.G. was crying. John admitted that he did not want to see the defendant in trouble because the defendant is his uncle. He did not recall telling a detective that Heather had come upstairs screaming, "he's raping her." He said S.G. was very intoxicated, but "definitely" understood what was going on around her.

The defendant testified on his own behalf. He said that after Megan, Cari, John, and Bud went upstairs, he went to the kitchen and sat on the bench at the table. S.G. came in and sat on his lap. They kissed for several minutes, and then the defendant began unbuttoning S.G.'s pants. S.G. stood up, removed her pants, and lay down on the bench with the defendant. They kissed some more and then had intercourse. S.G. "moaned and groaned" and had one hand around the defendant's neck. In his opinion she was coherent, was not intoxicated and did not pass out, fall asleep, or close her eyes. He said he weighed about 210 pounds and was not intoxicated. He did not remember telling two police detectives on December 1, 1992, that S.G. was very drunk and went into the bathroom because she was ill. He said he got the names of the females mixed up and was confused. He said that when he and S.G. were kissing on the bench, he asked her what she would "like." She did not appear bashful. He denied telling the detectives that he had intercourse with S.G. while she was lying across the kitchen table. He remembered Heather coming into the room and screaming that he was "fucking" S.G. He said S.G. did not begin to cry until after Megan and Cari came into the room. He said that S.G., in plain words, was "horny."

The jury found the defendant guilty, and he was subsequently sentenced to five years of imprisonment.

The defendant first contends that the State failed to prove him guilty beyond a reasonable doubt. When reviewing the sufficiency of the evidence leading to a conviction, the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Whitten*, 269 Ill. App. 3d 1037, 1040 (1995). In applying this standard, a court of review cannot substitute its assessment of the evidence and the inferences to be drawn from it for that of the trier of fact. *Whitten*, 269 Ill. App. 3d at 1040. As part of the defendant's argument on this point hinges on a determination of the credibility of the witnesses' testimony, we must also note that it is the trier of fact who determines the witnesses' credibility, and this court cannot substitute its judgment for that of the trier of fact as to the witnesses' credibility. *Whitten*, 269 Ill. App. 3d at 1040.

■ The defendant offers several cases in which Illinois courts have repeatedly refused to excuse from criminal liability defendants who were under the influence of alcohol at the time of the commission of a crime, even where the accused claimed to be unable to remember the events. See *People v. Leger*, 149 Ill. 2d 355 (1992); *People v. Hurt*, 175 Ill. App. 3d 970 (1988). While we acknowledge the logic of this line of cases, we find the reasoning inapposite to the instant case for several reasons. First, this line of cases involves *proactive* behavior on the part of the defendants who seek to avoid criminal liability by employing a "voluntary intoxication" defense.

Second, the public policy considerations underlying the courts' reluctance to accept voluntary intoxication as a defense to criminal liability do not apply. The statute prohibiting criminal sexual assault prohibits a person from taking sexual advantage of another when the other is unable to knowingly consent to the act. Thus, if the perpetrator knows that the other person may be unable, for any reason, to give consent to the sexual act, the perpetrator should refrain from taking advantage of the situation. *Whitten*, 269 Ill. App. 3d at 1042-43. The crime of criminal sexual assault is committed by the wrongful act of the accused, not the disability of the victim. *Whitten*, 269 Ill. App. 3d at 1042.

■ Thus, if the defendant does not have a reasonable belief that the other party has consented, he must refrain. The question before the jury was the reasonableness of the defendant's belief that S.G. had consented to sex. This determination necessarily hinges on the credibility of the witnesses. Where, as here, the accounts of events

conflict, it is for the jury to decide which account is more credible, and that determination will not be overturned on review unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Schott*, 145 Ill. 2d 188, 203 (1991). The jury had before it testimony from the complainant as well as from Heather that S.G. was unconscious immediately prior to and during at least part of the sex act. A reasonable fact finder could conclude that the amount of alcohol ingested by the 125-pound complainant could have left her incapable of being sufficiently roused to have knowingly given or refused consent to the defendant's advances. The facts that the complainant was able to move herself into the kitchen and that she *eventually* roused enough to realize what was happening do not necessarily undermine her contention that she was unconscious, or in a pronounced stupor, during the sex act.

The legislature clearly intends that section 12—13(a)(2) of the Criminal Code of 1961 (Code) (720 ILCS 5/12—13(a)(2) (West 1992)) applies to situations where an otherwise normally competent person is rendered temporarily unable to give knowing consent. The legislature has indicated that there are two different ways to commit the crime. The first is knowingly to have sexual relations with someone who is unable to understand the nature of the act. The second is knowingly to have sexual relations with someone who, for any reason, is unable to give knowing consent. *Whitten*, 269 Ill. App. 3d at 1042.

In the case before us, we are mindful of the defendant's argument that were this finding to be misconstrued an accused might be held liable for criminal sexual assault where his partner's inhibitions were merely relaxed through the consumption of alcohol. However, we note that the burden of proof remains with the State to show beyond a reasonable doubt that the accused knew that his partner may have been unable to give knowing consent. Where, as here, evidence is produced to show that the victim lost consciousness, a reasonable fact finder could conclude that the State met its burden of proof. We decline to speculate what events, short of loss of consciousness, would be likewise sufficient.

The defendant next contends that the trial court committed plain error when it instructed the jury that the definition of consent is "a freely given agreement." The defendant argues that this definition could have led the jury to conclude that mere impairment of the victim's faculties, such as by use of alcohol, was sufficient to negate the possibility of knowing consent. The defendant concedes that the complained-of instruction was submitted without objection by the defendant and an objection was also not raised in a post-trial motion,

and thus the waiver rule applies. See *People v. Enoch*, 122 Ill. 2d 176 (1988). However, he contends that this court should review the instruction as a plain error affecting substantial rights under Supreme Court Rule 615(a) (145 Ill. 2d R. 615(a)).

As the State notes, the instruction given by the trial court tracks the language of Illinois Pattern Jury Instructions, Criminal, No. 11.63A (3d ed. 1992) (hereinafter IPI Criminal), with the second sentence, which refers to the use of force, deleted. We note that the same definition of consent is found in section 12—17(a) of the Code, which provides that consent shall be a defense to criminal sexual assault where use of force or threat of force is an element of the offense. 720 ILCS 5/12—17(a) (West 1992).

The defendant argues that the instruction should not be used in cases where the victim's *capacity* to consent, rather than her *actual* consent, is at issue. The defendant contends that the definition of the term "freely" as it is commonly understood would allow the jury to interpret consent as "an agreement to act given exempt from external influence." Thus, he argues, the jury could have found lack of ability to consent if it merely believed S.G. to have been intoxicated. Further, it is argued, since at least some of the alcohol S.G. ingested was provided at the defendant's house, the jury could have found that he provided "external influence."

■ We do not conclude that the trial court's use of the definition found in the statute and the IPI Criminal instructions alters the elements of the offense which the jury was charged to consider. The trial court did not charge the jury with finding that consent must be "free of external influence." Rather, the jury was told that consent constitutes "a freely given agreement." Whether one *did not* freely agree to intercourse, or whether one was, for whatever reason, *unable* to freely agree to intercourse, the definition of "consent" remains the same. We find that the jury was correctly charged with determining whether S.G. was, at the time of the act, able to offer "a freely given agreement" to the defendant to engage in sexual intercourse. Thus, the jury had to decide, essentially, whether S.G. knew what the defendant wanted to do, and whether she agreed. As noted, some of the evidence proffered by the State showed that S.G. was unconscious when the defendant instituted the act. The jury found this evidence to be credible, found that S.G. was *unable* to agree to the act, and found that the defendant knew she was unable to agree because her level of consciousness should have been apparent to him.

■ The remainder of the defendant's arguments regarding whether the use of this instruction was plain error are speculations as to what the jury may have considered in rendering its verdict. We

find nothing in this record which lends credence to the defendant's contention that the jury may have convicted him on the basis of this instruction simply because it thought he took "unfair" advantage of an underage girl. This court is not permitted to speculate on the jury's thought process; rather, we review only whether its *result* is rational based on the objective evidence. See *People v. Collins*, 106 Ill. 2d 237, 261 (1985). We find that the use of the instruction in this case does not constitute plain error.

The defendant's final contention on appeal is that the trial court erred by telling the jury prior to deliberation that any request for transcripts of the witnesses' testimony would not be honored. The State contends that the defendant waived this issue by failing to make a contemporaneous objection and failing to raise the issue in a post-trial motion. See *Enoch*, 122 Ill. 2d 176. The defendant argues that this court should address the issue because "this sort of *in limine* warning to a jury is manifestly improper and should not be given under any circumstances." Moreover, the defendant argues, the waiver rule is "relaxed" when the conduct of the trial judge is at issue.

In support of the latter argument, the defendant cites *People v. Barrow*, wherein the trial court made remarks during *voir dire* suggesting its belief that the accused would be found guilty and that the jury would be called upon to deliberate the death penalty. *People v. Barrow*, 133 Ill. 2d 226 (1989). He further notes that *Barrow* relied on an older case, *People v. Sprinkle*, in which our supreme court noted that "the lawyer who objects to a comment or question by the judge may find himself viewed with considerable suspicion and skepticism by the very group [the jury] whom he is trying to convert to his client's view of the facts, thereby perhaps irreparably damaging his client's interests." *People v. Sprinkle*, 27 Ill. 2d 398, 400 (1963). This position does not, however, address the defendant's failure to raise a contention of error via post-trial motion. Nonetheless, in the interests of justice, we will address the defendant's argument.

■ The issue of a trial court's discretion with regard to a transcript request was addressed in *People v. Davis*, 105 Ill. App. 3d 549 (1982). In that case, the jury informed the bailiff that it wished to see a transcript of a certain portion of testimony. The bailiff, however, refused to inform the trial court of the request, and the jury thus concluded its deliberation and returned a guilty verdict. During the sentencing phase of the trial, the court was made aware of the bailiff's action and opined that it would have granted such a request if it had been made aware of it prior to the verdict. In reversing the defendant's conviction, the appellate court noted that a trial court

has the discretion to grant a jury's request for testimony, and it is reversible error for the court to refuse to exercise that discretion in the erroneous belief that it does not exist. As the trial court is ultimately responsible for the actions of its bailiff, the bailiff's erroneous assumption that the court did not have the power to provide transcripts inured to the trial court. *Davis*, 105 Ill. App. 3d at 555. The *Davis* court further noted that the court may not speculate as to the reasons for the request and may not decide on its own that the testimony requested is not critical. *Davis*, 105 Ill. App. 3d at 556. Decisions on whether to grant a transcript request, then, must be based on such objective factors as whether the testimony is still fresh in the jurors' minds and the hardship of obtaining the requested material within a reasonable amount of time. See *People v. Franklin*, 135 Ill. 2d 78 (1990). Absent an abuse of discretion, this court will not disturb a decision to deny a transcript request. See *People v. Olinger*, 112 Ill. 2d 324 (1986).

In informing the jury that transcripts would not be available, the trial court in this case verbally noted that the trial had been a short one, and thus the testimony was fresh in the jurors' minds. We note that the trial began on March 13, 1994, and ended on March 17, 1994. The jury returned its verdict on March 17. Thus, there was no appreciable delay in the proceedings, nor did the jury deliberate for a great length of time such that the testimony may have grown stale. We assume from the trial court's preemptive statement that it would have denied any request made during deliberations. For the reasons noted, we conclude that we would have found no abuse of discretion in such a denial based on the relevant circumstances in this case. We therefore find that the defendant in this case suffered no prejudice and the trial court's error was therefore harmless.

Notwithstanding the lack of prejudice to this defendant, we are compelled to further address this issue. Although we conclude that the error does not require reversal in this case, we nonetheless agree with the defendant's contention that such a "preemptive strike" by the trial court is improper. The fact that the objective circumstances of this case would have compelled us to find no abuse of discretion had the trial court refused a transcript request does not mean that we can condone a practice which presents such risk for *potential* prejudice to defendants. If this had been a longer trial, such that the testimony was not fresh in the jurors' minds, or if other circumstances existed which made it less clear that the trial court acted properly in refusing a transcript request, we would be compelled to reverse because we would be unable to determine whether the defendant had suffered prejudice. As noted, the trial court has a duty to

exercise its discretion as to whether to grant a jury's transcript request. See *Davis*, 105 Ill. App. 3d 549. We cannot condone the abdication of the trial court's duty to consider a request at the time it is made merely because the considerations are the same prior to jury deliberation as during it. While the court's considerations are identical, the circumstances providing the context in which the court considers the request, such as the length of time since the jury heard the testimony in question, may have changed dramatically. Thus, a trial court must exercise its discretion at the time a request by a jury for transcripts of the witnesses' testimony is made and may not preempt a future request with a blanket admonition.

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

BOWMAN and RATHJE, JJ., concur.