2015 IL App (1st) 131962

FIRST DIVISION
SEPTEMBER 14, 2015

No. 1-13-1962

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 4842 |
| | ) | |
| LUIS ROLDAN, | ) | Honorable |
| | ) | Noreen Valeria Love, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Justices Connors and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a joint bench trial with codefendant Abraham Ramos (Ramos), who is not a party to this appeal, defendant Luis Roldan was found guilty of two counts of criminal sexual assault (CSA) (720 ILCS 5/11-1.20 (West 2012)), and sentenced to consecutive terms of four years' imprisonment. On appeal, defendant contends that the evidence was insufficient to prove him guilty of this offense beyond a reasonable doubt.

¶ 2     The evidence adduced at trial shows that defendant and Ramos were charged with CSA in connection with events that took place on March 6, 2011, in Cicero, Illinois. That evening, Esperanza Castellanos, Yesenia Guerrero, and the victim, J.T., planned to go to a movie theater in Cicero to celebrate Yesenia's seventeenth birthday. When they could not decide which movie to see, they called Ramos, who arrived at the movie theater with his female cousin, Isamar. The group then drove to the home of Ramos' aunt, where he lived at the time.

¶ 3    J.T. testified that when they were in the living room, Ramos asked whose birthday it was, and then their ages. She told him she was 16, Yesenia told him she had just turned 17, and J.T. did not recall Esperanza answering that question.

¶ 4    At that point, Ramos gave Yesenia a one-liter bottle of Smirnoff vodka that was a third to halfway full and told her it was her birthday present. Yesenia started drinking straight out of the bottle, and J.T. also took a drink from it. J.T. testified that she had never consumed alcohol prior to that day. When Yesenia finished that bottle of vodka, Ramos produced an identical, but unopened one-liter bottle of Smirnoff vodka for them to drink.

¶ 5    Defendant, whom J.T. had never met before, arrived at the home of Ramos' aunt with orange juice, which he, Ramos, J.T., Yesenia, and Esperanza mixed with the vodka and used to play a drinking game that involved playing cards which dictated the length of the drink to be taken. She testified that Ramos provided each person with a cup that was about 8 to 10 inches tall and filled with 1 to 2 inches of vodka. He prepared the first round of drinks, then each girl either filled her own cup with the vodka and orange juice mixture, or he filled the cup for her.

¶ 6    After playing the drinking game for about an hour, the group ran out of orange juice and decided to go to Walgreens to buy more. Each of the five participants had finished two to four cups of the orange juice and vodka mixture at that point, with Yesenia drinking the most and J.T. a little less.

¶ 7    J.T. further testified that Yesenia wanted to accompany the others to Walgreens, but they decided she was too drunk to come along and made her sleep on the couch in the living room. On the way to Walgreens, J.T. walked with defendant, while Esperanza walked ahead of them with Ramos. J.T. testified that she was having trouble walking, and recalled that she and defendant

kissed inside the store. She also remembered arguing with Ramos outside the store, but her next recollection was hearing "a lot of loud noise" and sitting in a chair in the hospital the following morning where she had her blood drawn. She did not remember returning to the home of Ramos' aunt, speaking to detectives, arriving at the hospital that night, or having sex with defendant.

¶ 8    Yesenia essentially testified to the same sequence of events as J.T., which brought them to the home of Ramos' aunt, where he inquired into their ages, and they played a drinking game. She also testified that she and J.T. were best friends prior to the events of March 6, 2011, but were no longer friends. She stated that J.T. did not seem drunk earlier in the evening, but later that night, she observed J.T. asleep on a bed in the home of Ramos' aunt. Yesenia testified that she had the most to drink that night, and J.T., in comparison, drank a little less than her, but more than the other three. When Esperanza and Ramos returned from the store, she woke up and realized that J.T. and defendant were not with them. She attempted to call J.T. on her cell phone, but J.T. did not answer, so Yesenia called her friend, Jose, to help her look for J.T.

¶ 9    When J.T. returned to the home of Ramos' aunt, Yesenia noticed that J.T. seemed fine and did not look like she was drunk. Jose then took Yesenia home, where her parents noticed that something was wrong. They contacted J.T.'s parents and, with Yesenia, returned to the home of Ramos' aunt. Upon arrival, Yesenia discovered J.T. lying on the bed in a boy's bedroom wearing boy's pants, which were not the pants she had been wearing earlier in the evening. When neither Yesenia nor J.T.'s mother could wake J.T., they called police.

¶ 10    Cicero police officer Walberto Galarza arrived on the scene about 11 p.m. and observed a girl lying on a bed in one of the bedrooms. Officer Galarza attempted to rouse the girl by shaking her by the shoulders, but she did not wake up so he called the paramedics. They were able to

rouse J.T., but as they led her to a wheelchair, she appeared to need help walking. Officer Galarza noted that J.T. was belligerent and swearing at her parents as she was taken away by the paramedics. Officer Galarza noted in his police report that J.T. was shouting only at her parents and did not shout anything toward Ramos, whom he arrested.

¶ 11 Assistant State's Attorney Nicolas Kantas testified that he spoke with defendant at the Cicero police department and that their conversation was reduced to a typewritten statement signed by defendant. Therein, defendant stated that he was 21 years old and that during the walk back to the house from Walgreens, J.T. repeatedly told him that she wanted to have sex with him. Defendant told J.T. he would not have sex with her because "she would regret it in the morning because she was drunk." However, J.T. kept asking him, and he eventually had sex with her in his car, which was parked a couple of blocks down the street from the home of Ramos' aunt. Before doing so, he left J.T. in his car while he retrieved a condom and, after having sex with her, he left the condom on the floor of his car and walked back to the house with J.T. Defendant then returned home because his mother was calling for him. Defendant stated that throughout his sexual encounter with J.T., she seemed coherent and responsive.

¶ 12 Assistant State's Attorney Kantas further testified to his interview with Ramos and published his typewritten, signed statement to the court.[1] Ramos stated that when J.T. returned to his aunt's home after the trip to Walgreens, she attempted to kiss him, but he told her "to stop because she had too much vodka." When J.T. again attempted to kiss Ramos, he took her to one

_____

[1] Although Ramos' statement was not offered against defendant, and not considered by this court in determining whether he was proved guilty beyond a reasonable doubt, it is included in the factual background in order to fully address defendant's contention on appeal that the trial court improperly relied on evidence not offered against him in finding him guilty.

of the empty bedrooms in the house, where they had sex for about 10 minutes. Ramos' typewritten statement further explained that he eventually opened the door to the bedroom because Esperanza had been knocking on it for several minutes attempting to speak with J.T. Esperanza and J.T. spoke briefly while J.T. was lying on the bed wearing a pair of boy's pants Ramos had given her. Shortly thereafter, J.T.'s parents arrived and Officer Galarza arrested Ramos.

¶ 13     The parties then stipulated that, if called to testify, Angela Kaeshamer, a DNA analyst employed by the Illinois State Police, would state that she received a condom retrieved from the floor of defendant's car by the Cicero police. She discovered human male DNA on the condom that she could say with a reasonable degree of scientific certainty belonged to defendant, and not Ramos. She would also testify that the non-sperm fraction of the DNA collected represented a sample from which J.T. could not be excluded.

¶ 14     Ramos' cousin, Isamar, testified on behalf of defendant that she did not drink any alcohol that night and that she observed J.T., who did not act drunk at any point, throughout the night. She also saw Esperanza speaking with J.T. on the bed in Ramos' room later that night, and that J.T. was appropriately responsive during the conversation with Esperanza. Isamar further testified that when J.T. was being led out of the bedroom by the paramedics, she shouted at police to let Ramos go.

¶ 15     Esperanza testified on behalf of defendant that during her encounters with J.T. throughout the night, J.T. did not seem drunk. She observed that J.T. did not need assistance walking, that she was responsive to questions, and that her speech was not slurred. Esperanza testified that during the walk back from Walgreens, she and Ramos lost sight of J.T. and defendant and could

not locate them. Esperanza called J.T. several times on her cell phone, but J.T. did not answer. Esperanza further testified that J.T. seemed fine when she returned to the home of Ramos' aunt (presumably) after having sex with defendant, but later that night it was difficult to wake J.T. and she was stumbling when she was being led out of the house by the paramedics.

¶ 16    Defendant was informed of his right to testify, but declined. Following closing arguments, the court found defendant guilty of CSA. In announcing its decision, the court stated that when people are drunk enough, they can sometimes go into a "blackout state," where they are unable to remember anything. Although the court noted defendant's contention that the State failed to introduce a toxicology report into evidence, the court stated that it did not know if a toxicology report was done, and the State would be unable to produce evidence it did not have. However, the court noted that J.T. was 16 years old and small in frame and had consumed a lot of alcohol in a short period of time and later and neither the police nor her parents were able to wake her. The paramedics were eventually able to rouse her and she had to be carried to a wheelchair. The court stated that these circumstances indicated that J.T. was heavily intoxicated that night, and regardless of her actions toward the two defendants, she was unable to give knowing consent to sexual intercourse. The court found it significant that both defendants stated in their typewritten statements that they knew J.T. was drunk shortly before having sex with her, and concluded that defendant knew or should have known that J.T. was unable to give knowing consent because she was in a blackout state and he knew she was impaired.

¶ 17    In this appeal from that judgment, defendant contends that the record is devoid of credible testimony and medical evidence to support the determination that he *knew* J.T. was unable to give knowing consent. He maintains that J.T.'s speech, actions, and demeanor

throughout the night were insufficient to lead him to believe that she was intoxicated to the point where she could not consent.

¶ 18    Where defendant challenges the sufficiency of the evidence to sustain his conviction, the reviewing court must consider whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Jordan*, 218 Ill. 2d 255, 269-70 (2006). This standard recognizes the responsibility of the trier of fact to determine the credibility of the witnesses and the weight to give their testimony, to resolve any conflicts and inconsistencies in the evidence, and to draw reasonable inferences from such evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). A reviewing court must allow all reasonable inferences from the record in favor of the prosecution, and will not overturn the decision of the trier of fact unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. *People v. Beauchamp*, 241 Ill 2d 1, 8 (2011); *People v. Smith*, 185 Ill. 2d 532, 542 (1999).

¶ 19    The Due Process Clause of the Fourteenth Amendment to the United States Constitution ensures that an accused defendant is not convicted of a crime "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *People v. Carpenter*, 228 Ill. 2d 250, 254 (2008); see also, *People v. Ehlert*, 211 Ill. 2d 192, 213 (2004) ("Simply stated, the fact that a defendant [may be] guilty does not equate to guilty beyond a reasonable doubt"). To sustain defendant's conviction of CSA in this case, the State was required to prove beyond a reasonable doubt that defendant knew the victim was "unable to understand the nature of the act or [was] unable to give knowing consent." 720 ILCS 5/11-1.20(a)(2) (West 2012). In this context, "consent," refers to the victim's

"freely given agreement" to the act of sexual intercourse. 720 ILCS 5/11-1.70(a) (West 2012). The focus is on what the defendant knew or reasonably should have known regarding the victim's willingness or ability to give knowing consent. *People v. Whitten*, 269 Ill. App. 3d 1037, 1042 (1995). If defendant has reason to believe that the victim is unable to give consent, he should abstain from engaging in any sexual contact with the victim. *Id*. at 1043.

¶ 20    Viewed in a light most favorable to the prosecution, the evidence presented in this case shows that defendant and J.T. were among those who played a drinking game at the home of Ramos' aunt, in which J.T. consumed a large amount of alcohol and orange juice over a period of time. The group then walked to Walgreens to purchase more orange juice. Varying accounts were given by witnesses as to J.T.'s ability to walk and speak normally during that period of time. J.T. testified that she was having trouble walking, and although she recalled kissing defendant in the Walgreens store and arguing with Ramos outside of the store, she did not recall anything else until she was in the hospital the following morning. However, evidence was also presented that J.T. had no trouble walking and in defendant's typewritten statement he stated that on the way back from the store, J.T. repeatedly told him that she wanted to have sex with him, but he initially declined, telling her that she would regret it because she was drunk. Notwithstanding his initial hesitation, defendant eventually had sex with J.T. in his car, after which defendant and J.T. walked back to Ramos' aunt's house, where defendant left J.T. Thus, the record is devoid of any credible evidence to support the determination that at the time of defendant's sexual encounter with J.T., defendant *knew* J.T. was unable to give knowing consent. *People v. Lloyd*, 2013 IL 113510, ¶ 44.

1-13-1962

¶ 21    The trial court found that J.T. was in a "blackout" state and could not have consented to the sexual intercourse. However, no evidence was introduced at trial that J.T. was blacked out at the time she had sex with defendant. The only evidence was defendant's statement that J.T. repeatedly asked him to have sex with her and that he initially refused, but later complied. It appears that the trial court concluded that J.T. could not have consented to sex with defendant based on her condition later that night. However, for purposes of determining the validity of the trial court's conclusion, including the blackout theory, the critical point in time is during the sexual encounter between J.T. and defendant. The record contains no evidence of a "black out" or other behavior by J.T. at the time of her sexual encounter with defendant, which suggests that defendant should have known that J.T. lacked the ability to give knowing consent. The trial court may rely only upon evidence that it has acquired at trial, or of which it may take judicial notice (*McGurn v. Brotman*, 25 Ill. App. 2d 294, 298 (1960)), *i.e.*, those matters capable of instant and unquestionable demonstration (*People v. Davis*, 65 Ill. 2d 157, 161 (1976)). The court may not, however, take notice of critical evidentiary material that was not presented at trial. *People v. Barham*, 337 Ill. App. 3d 1121, 1129 (2003).

¶ 22    Here, the State introduced J.T.'s own testimony that she did not remember certain parts of the night, including the sexual encounter with defendant. On the contrary, there was evidence that J.T. walked back to the home of Ramos' aunt, unassisted, after the sexual encounter with defendant. This is clearly insufficient to meet the standard of proof beyond a reasonable doubt that J.T. was so impaired that she could not have given knowing consent. Thus, the court, in issuing its ruling, may not assume, without sufficient evidence on the record (*Davis*, 65 Ill. 2d at 161), that J.T. was in a blackout state and therefore unable to give knowing consent.

¶ 23    There was testimony from both State and defense witnesses that, although J.T. had consumed alcohol that night, she did not appear to be impaired to the point where it was obvious that she could not consent.  The evidence showed that J.T. was able to walk to Walgreens, accompany defendant to his car, where the sex act took place and then walk back to Ramos' aunt's house without assistance. Yesenia, Esperanza, and Isamar each testified that throughout the night, J.T. seemed "fine," was not acting drunk, and did not need assistance standing or walking. Each also testified that J.T.'s speech was normal and that she was speaking in a normal cadence and not slurring her words. Although J.T.'s parents and Yesenia could not wake her up later that night, there is nothing in the record to indicate that she blacked out immediately before, during, or immediately following her sexual encounter with defendant. Further, there was no evidence, relevant to defendant's case, regarding what J.T. did in the interim between when she had sex with defendant and when she was later found unresponsive in the bedroom of the home of Ramos' aunt.

¶ 24    At the sentencing hearing, the State compared this case to *People v. Fisher*, 281 Ill. App. 3d 395 (1996), but we find that the State misapplied the reasoning in that case to the case at bar. The defendant in *Fisher* was found guilty of CSA for having sex with a 15-year-old girl who had consumed a lot of alcohol and was unconscious before, after, and at least partially during the sexual intercourse. *Id*. at 397. Based on the testimony of the victim and another witness, the jury found that defendant knew or should have known that the victim in that case was incapable of giving knowing consent because she was unconscious before and during the sex act. *Id*. at 402. The court in that case also noted that its holding should not be misconstrued so that a defendant may be held liable for CSA where his "partner's inhibitions were merely relaxed through the

consumption of alcohol." *Id*. at 403. In other words the consumption of alcohol does not necessarily render a person unable to consent to sex.

¶ 25    Here, the only uncontroverted evidence in the record indicating J.T.'s condition at the time she had sex with defendant was defendant's own statement to her that she was drunk and would regret having sex with him in the morning. Like the court noted in *Fisher*, under the facts of this case, defendant knew J.T. had consumed alcohol, but no evidence supports the conclusion that he knew that rather than simply having relaxed inhibitions, she was completely unable to consent. Thus, without more, this is insufficient to meet the State's burden of showing beyond a reasonable doubt that defendant knew that J.T. was incapable of giving knowing consent. *Lloyd*, 2013 IL 113510, ¶ 44.

¶ 26    We also observe that J.T. testified that her blood was drawn at the hospital; however, there was no further inquiry into whether the blood was used for a toxicology report or was drawn for another purpose. Notably, the State did not introduce any medical evidence that J.T. was in a blackout state as a result of her consumption of alcohol. Similarly, there was no medical evidence presented by the State regarding the physiology of alcohol consumption and how it may have been a factor in this case.

¶ 27    Thus, the focus is on what defendant knew or should have known regarding J.T.'s condition. *Whitten*, 269 Ill. App. 3d at 1042. Here, the court accepted J.T.'s testimony that she did not remember large portions of the night, including having sex with defendant, and therefore, the court assumed that J.T. must have been too intoxicated to knowingly consent. However, regardless of what J.T. remembers, the burden remains upon the State to produce credible

evidence, beyond a reasonable doubt, that defendant knew or should have known of J.T.'s inability to give knowing consent to sexual intercourse at the point in time that the act took place.

¶ 28     The record is devoid of credible evidence to show that the State met its burden. *Lloyd*, 2013 IL 113510, ¶ 44. Accordingly, we reverse defendant's conviction for criminal sexual assault.

¶ 29     Reversed.