2022 IL App (2d) 210698-U
No. 2-21-0698
Order filed November 21, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Winnebago County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-CF-2108 |
| | ) | |
| TROY ROSSATO, | ) | Honorable |
| | ) | Debra D. Schafer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Brennan and Justice Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The State proved beyond a reasonable doubt that (1) the victim lacked the ability to knowingly consent to sexual acts and (2) defendant was aware of her inability to give knowing consent.  Although defendant testified that his sex with the victim was consensual, the trial court appropriately credited the testimony of other witnesses, who described the victim as severely intoxicated and barely conscious.

¶ 2    Defendant, Troy Rossato, appeals from the judgment of the circuit court of Winnebago County finding him guilty of two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(2) (West 2018)).  He contends that the State failed to prove beyond a reasonable doubt that (1) the

victim, L.R., was unable to give consent and (2) he knew that L.R. was unable to give consent. Because the evidence established both elements beyond a reasonable doubt, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State indicted defendant on one count of criminal sexual assault based on his having inserted his finger in L.R.'s vagina while knowing that she was unable to give knowing consent (720 ILCS 5/11-1.20(a)(2) (West 2018)) and one count of criminal sexual assault based on his having inserted his penis into L.R.'s vagina while knowing that she was unable to give knowing consent (720 ILCS 5/11-1.20(a)(2) (West 2018)).

¶ 5      At defendant's bench trial, L.R. testified that, on July 13, 2018, she worked at a restaurant in Rockford. After her shift, she and a coworker, Hannah Timmer, decided to go out drinking. Timmer drove, and L.R. left her vehicle at the restaurant.

¶ 6      The pair went to a bar, stayed a short while, and then drove to a second bar. Defendant and a friend, Dylan Badker, were at the second bar. L.R. knew Badker, as he dated another of her coworkers. However, L.R. had never met defendant. At the bar, L.R. had a "couple of drinks" while she and Timmer waited for Timmer's friends to arrive.

¶ 7      After Timmer's friends arrived, Timmer invited them to her house to swim and drink. L.R. and Timmer left first and drove to Timmer's house. Badker texted and called Timmer several times seeking an invitation to her house.

¶ 8      Shortly after they arrived at the house, Timmer's friends began arriving. Badker and defendant also arrived. The house had an indoor pool and a bathroom in the same area. Upstairs from the pool area was a loft with Timmer's bedroom and another bathroom. L.R. borrowed a swimsuit from Timmer. While she swam and played games, L.R. was "still drinking." At one point, L.R. was definitely "feeling real drunk."

¶ 9    As L.R. played a game called "Jenga," defendant commented that she would not be able to make a successful move.  L.R. replied, " 'Watch me.' "  According to L.R., that was her only interaction with defendant.

¶ 10    The next thing L.R. remembered was being in the downstairs bathroom and vomiting into the toilet.  She described herself as "extremely intoxicated."  She then recalled Timmer and one of Timmer's friends helping her up the stairs.  They sat her on Timmer's bed.  She was slumped over and "couldn't really move."  She remembered Timmer helping her undress and putting a robe on her.  She had no clothes on under the robe.  L.R. fell asleep in bed.

¶ 11    L.R. awoke to someone trying to penetrate her vagina with his fingers.  At first, she could not see who it was.  Then, she remembered "him" kissing her neck and asking her if it felt good.  Although she felt a beard, she could not see the person's face.  She tried to keep her legs closed because she could not speak.  The fingers penetrated her vagina.  She then passed out.  According to L.R., she was in and out of consciousness several times.

¶ 12    When she awoke, "it was happening again."  She tried to say no but could not speak.  She tried to roll away but passed out again.  At one point, she awoke and felt someone on top of her.  She could now see that it was defendant, penetrating her vagina with his penis.  He also put his fingers in her vagina.  According to L.R., she tried to scream, but nothing came out.  When she tried to hit him, her arm went limp.  She heard defendant say, "It feels good.  I know it does."  L.R. then passed out again.

¶ 13    She remembered defendant waking up next to her and "fingering [her]."  L.R. was able to roll away and pull herself against the wall.  She was crying and saw defendant walk away. That was the last time she saw defendant.  She then passed out again.

¶ 14    The next morning, Timmer woke L.R. up and took her to her car.  She drove herself home.  When her roommate talked to her, L.R. could not hear her.  L.R. went upstairs to bed.  She slept until around 2 or 3 p.m.

¶ 15    After waking, L.R. began recalling things from the night before.  She texted Timmer and asked if anyone had been in the bedroom.  After speaking with Timmer, L.R. called her father and asked him to accompany her to the hospital.  She met with a doctor and nurse and completed a sexual assault examination.  L.R. denied ever telling defendant that she wanted to have sex with him.

¶ 16    On cross-examination, L.R. testified that she had one drink at the first bar and stayed at the second bar for about an hour to an hour and a half.  When she and Timmer left the bar, Timmer said goodbye to Badker.  After that, he called her multiple times.  According to L.R., Badker invited himself and defendant to Timmer's house.

¶ 17    After putting on a swimsuit, L.R. went downstairs and made herself and Timmer a drink.  L.R. did not recall there being a hot tub.

¶ 18    There were several people, including defendant, around a table, taking turns playing Jenga.  She thought she played Jenga twice with defendant.  The next thing L.R. remembered was vomiting inside the downstairs bathroom.  Timmer was there with one of her male friends.  L.R. could hear Badker.  The next thing she recalled was someone helping her up the stairs.  She did not know when she fell asleep, but it was "pretty late."  She recalled hearing people and music downstairs.

¶ 19    After waking L.R. the next morning, Timmer dropped her off at her car at around 9 a.m.  L.R. drove 30 to 35 minutes to get home.  She was "very out of it" and did not know how she made it home.

¶ 20    Timmer testified that she worked with L.R. on July 13, 2018. After work, Timmer drove them to her house so they could change clothes and go out. According to Timmer, Badker and defendant were at the first bar. She knew Badker but had never met defendant before. At some point, some of Timmer's friends joined them. All of them were drinking at both bars.

¶ 21    At some point, Timmer and L.R. left the second bar and went to Timmer's house. Timmer had invited several of her friends to swim and hang out. Several of Timmer's friends showed up. Badker and defendant arrived later. The group was drinking and swimming. Timmer described L.R. as a "little social butterfly." At one point, Timmer saw one of the guests, Blair Beeman, helping L.R. up the stairs. Timmer joined in assisting L.R. up the stairs and into Timmer's bed. According to Timmer, L.R. was "[t]otally out of it. Throwing up. Just, like, very lethargic and heavy." L.R. could barely speak.

¶ 22    After getting L.R. to the bedroom, Timmer helped undress her and put her in a robe. Timmer testified that both Badker and defendant were in the room, and Badker helped put L.R. in bed. Badker also helped position L.R. on her side so she would not vomit and aspirate. They did so because L.R. was so drunk. After putting L.R. in bed, they put a garbage can on the floor next to the bed and tucked her in. When Timmer left the room, L.R. was asleep, and no one else remained.

¶ 23    After going downstairs, Timmer went outside with Badker and picked up cigarette butts. Defendant remained inside. After about 15 minutes, Timmer went back inside. When she did, she saw defendant coming down the stairs from her bedroom. Timmer "freaked out" because she wanted to know why defendant was in the bedroom when L.R. was "like, black-out drunk." By "black-out drunk," she meant that L.R. was "[e]ssentially[ ] unconscious" and "[n]ot able to make a decision for herself." When Timmer asked defendant why he was upstairs, he said, " 'I didn't

do anything she didn't want.' " Timmer then said they should go upstairs and ask L.R., because Timmer knew that L.R. would be unable to respond.

¶ 24    When Timmer went upstairs, she saw L.R. lying against the wall in bed. She was not "awake and talking." Rather, she was moaning and saying no. When Timmer tried to wake L.R., she did not open her eyes but continued to moan. She could not form a sentence. Timmer then went downstairs and told Badker and defendant to leave, or she would call the police. They left.

¶ 25    On cross-examination, Timmer testified that a hot tub was in the pool area and that some guests used it. She saw L.R. get sick in the upstairs bathroom. After Beeman left the bedroom, Badker helped L.R. get in Timmer's bed. According to Timmer, defendant just stood there and watched them put L.R. in bed. Timmer, Badker, and defendant went downstairs at the same time.

¶ 26    Beeman testified that she was at Timmer's house on July 13 to July 14, 2018. She had not met Timmer or L.R. before that night. She and several other people, including L.R., swam in the pool. After swimming, Beeman saw L.R. in the downstairs bathroom, vomiting in the toilet. Although Beeman was "pretty drunk" herself, she and Timmer helped L.R. up the stairs. They then helped her out of her swimsuit. The last time Beeman saw L.R., she was asleep in bed. There were other people upstairs in the bedroom, but she could not recall who.

¶ 27    On cross-examination, Beeman admitted to having two drinks at a bar before arriving at the house. She continued drinking after arriving at the house. She admitted to blacking out after putting L.R. to bed.

¶ 28    On July 14, 2018, Emily Bunton worked as an emergency room nurse at a hospital in Rockford. L.R. came in for a sexual assault examination. According to Bunton, she did not observe any external injuries on L.R.'s vagina or anus but added that she does not always see such

injuries in sexual assault cases. No urine sample was taken from L.R., but Bunton could not recall why.

¶ 29    Following the close of the State's case, defendant moved for a directed finding. He argued, among other things, that the State had failed to show that he knew that L.R. was unable to give knowing consent. In doing so, he cited *People v. Fisher*, 281 Ill. App. 3d 395 (1996). The trial court denied the motion.

¶ 30    Defendant testified that, on July 13, 2018, his fiancée dropped him off at a bar in Rockford. After a while, he called Badker to join him. According to defendant, he and Badker met L.R. and Timmer in the parking lot while defendant was having a cigarette. L.R. and Timmer said that they had just come from another bar. They all went into the bar, and defendant went back to playing slots. At some point, L.R. and Timmer left. Badker and defendant left around an hour later.

¶ 31    Because they had been invited to Timmer's house, they stopped and bought a 12-pack of beer. They also brought a Jenga game. They arrived around 11:45 p.m., and Timmer greeted them outside.

¶ 32    Defendant went into the pool area and sat at a table, playing cards and Jenga. According to defendant, while playing cards, he and L.R. had small talk and flirted with each other. After cards, he played Jenga. L.R. also played Jenga. Defendant made one comment to L.R. about how she was playing the game, but otherwise, it was a "flirtatious back and forth."

¶ 33    According to defendant, after the Jenga game, L.R. got in the hot tub. At one point, she looked over at defendant and made a gesture indicating oral sex. Defendant had no further interaction with L.R. at that point.

¶ 34    Defendant testified that he was outside smoking when L.R. went upstairs. When he came inside, she was no longer downstairs. He was downstairs for about 15 minutes and then asked to use the bathroom. Timmer told him to use the upstairs bathroom.

¶ 35    According to defendant, L.R. was awake when he passed through the room to use the bathroom. He had no interaction with her before he used the bathroom. After exiting the bathroom, he asked, " 'You good over there?' " According to defendant, L.R. said, " 'Yeah. Come here.' " L.R. was in the middle of the bed. Defendant went over to her. They chatted "and one thing led to the next." They kissed and then had sex. According to defendant, while they were having sex, L.R. said, " 'Yes, daddy. More, daddy.' " They had sex in several positions. After defendant ejaculated, L.R. gave him oral sex until he was erect. Then, she got on top of him, and they had sex again.

¶ 36    Defendant denied that L.R. ever passed out or fell asleep. After they had sex, L.R. asked him if he had a girlfriend. When he told her that he did, she said that she felt dirty. Defendant testified that he then laid there for about 15 to 20 minutes before they both fell asleep. Defendant awoke around 6:30 a.m., left the bedroom, and went downstairs to the pool area. Timmer and Badker were there. Timmer said that she was going upstairs to talk with L.R. Defendant started cleaning up beer cans and cigarette butts. When Timmer came downstairs, he thanked her for having them over and left with Badker. Defendant again denied that he penetrated L.R.'s vagina with either his fingers or his penis while she was passed out.

¶ 37    On cross-examination, defendant acknowledged that L.R. was drinking and having fun at Timmer's. Defendant denied seeing L.R. vomit. According to defendant, L.R. was wearing a one-piece satin lingerie in bed. He asked her if she wanted to have sex and she answered yes.

¶ 38    In ruling, the trial court noted that the question was not whether defendant and L.R. had sex but whether the sex was consensual. The court observed that there was little evidence of who was drinking what and how much. However, the court noted that L.R., Timmer, and Beeman all testified that L.R. was drunk. The court pointed to Timmer's testimony that L.R. "was totally out of it. She was very lethargic, throwing up and barely speaking." The court noted that defendant denied seeing L.R. vomit or any other evidence that she was drunk. In the court's view, the conflicting accounts of L.R.'s condition raised a credibility question. The court resolved the conflict by finding L.R., Timmer, and Beeman more credible than defendant. The court concluded that L.R. was unable to give knowing consent to sex with defendant. Thus, the court found defendant guilty of both counts.

¶ 39    In his motion for a new trial, defendant argued, among other things, that the trial court did not adequately consider whether the State proved beyond a reasonable doubt that defendant was aware that L.R. was unable to give knowing consent. Defendant noted that "[t]he crime of criminal sexual assault is committed by the wrongful act of the accused, not the disability of the victim." *Fisher*, 281 Ill. App. 3d at 402 (citing *People v. Whitten*, 269 Ill. App. 3d 1037, 1042 (1995)).

¶ 40    At the hearing on the motion, the court addressed defendant's argument by pointing to the evidence that L.R. "was incoherent at the time that she was being sexually assaulted and unable to give knowing consent based on the description that was provided by other witnesses as to her condition." The court concluded: "I don't know how any person in that room couldn't have known she was unable to give knowing consent." Accordingly, the court denied defendant's motion.

¶ 41                                    II. ANALYSIS

¶ 42    On appeal, defendant contends that the State did not prove beyond a reasonable that (1) L.R. was so intoxicated that she was unable to knowingly consent to sex and (2) defendant knew that L.R. was unable to knowingly consent.

¶ 43    When presented with a challenge to the sufficiency of the evidence, our function is not to retry the defendant. *People v. Ressa*, 2019 IL App (2d) 170439, ¶ 42. Rather, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Ressa*, 2019 IL App (2d) 170439, ¶ 42. The trier of fact is responsible for assessing the credibility of the witnesses, weighing their testimony, resolving inconsistencies and conflicts in the evidence, and drawing reasonable inferences. *Ressa*, 2019 IL App (2d) 170439, ¶ 42. We will not substitute our judgment for that of the trier of fact on witness credibility or the weight of the evidence. *Ressa*, 2019 IL App (2d) 170439, ¶ 42. We will not reverse a guilty finding unless the evidence, viewed in the light most favorable to the prosecution, was so palpably contrary to the guilty finding, or so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Ressa*, 2019 IL App (2d) 170439, ¶ 42.

¶ 44    A person commits criminal sexual assault if he (1) commits an act of sexual penetration and (2) knows that the victim is unable to understand the nature of the act or is unable to give knowing consent. 720 ILCS 5/11-1.20(a)(2) (West 2018). The sexual assault statute prohibits a person from taking advantage of another when the other is unable to knowingly consent to the sexual act. *Fisher*, 281 Ill App. 3d at 402. Accordingly, if the perpetrator knows that the other person may be unable, for any reason, to consent to the sexual act, the perpetrator must refrain from taking advantage of the situation. *Fisher*, 281 Ill. App. 3d at 402. As noted, "[t]he crime of criminal sexual assault is committed by the wrongful act of the accused, not the disability of the

victim." *Fisher*, 281 Ill. App. 3d at 402 (citing *Whitten*, 269 Ill. App. 3d at 1042). Put another way, the State must prove beyond a reasonable doubt that the defendant knew the victim was unable to give knowing consent because of her intoxication. *People v. Lloyd*, 2013 IL 113510, ¶ 42; see also *Whitten*, 269 Ill. App. 3d at 1042.

¶ 45     Consent requires a freely given agreement to the sexual conduct at issue. *People v. Beasley*, 314 Ill. App. 3d 840, 845 (2000). Knowledge of a material fact includes awareness of the substantial probability that the fact exists. 720 ILCS 5/4-5(a) (West 2018). Whether a person acted with knowledge may be inferred from circumstantial evidence. *People v. Hall*, 273 Ill. App. 3d 838, 842 (1995). Inferences regarding a defendant's mental state are particularly a matter within the province of the trier of fact. *People v. DiVincenzo*, 183 Ill. 2d 239, 253 (1998). The sole limitation of using circumstantial evidence is that the inferences drawn must be reasonable. *People v. Grathler*, 368 Ill. App. 3d 802, 808 (2006).

¶ 46     We begin by deciding whether there was sufficient evidence of L.R.'s inability to give knowing consent. There was.

¶ 47     There was ample evidence that L.R. had been drinking to the point that she was extremely intoxicated. L.R. and Timmer testified that L.R. began drinking earlier at a bar (Timmer said they drank at two bars) and continued to drink at Timmer's house. Even defendant admitted that L.R. was drinking at the house. L.R. described herself as "real drunk" and "extremely intoxicated." Timmer described L.R. as being "totally out of it." L.R. was so drunk that she vomited in the downstairs bathroom and had to be helped upstairs, undressed, clothed in a robe, and put into bed.

¶ 48     Once in bed, L.R. immediately fell asleep. During the sexual encounter, she was in and out of consciousness and unable to speak or physically resist. Finally, after defendant left the room, L.R. again passed out. When viewed in the light most favorable to the prosecution, the

evidence clearly established that L.R. was so intoxicated that she was unable to knowingly consent to sex with defendant.

¶ 49    Although defendant points to the fact that L.R. was able to drive home the next morning, L.R. testified that she was "very out of it" while driving and did not know how she made it home. That shows that L.R. had not yet completely recovered from her intoxicated state.

¶ 50    We next address whether the State proved that defendant knew that L.R. was unable to give knowing consent.  We begin by noting that, in a bench trial, the trial judge is presumed to know and follow the law, and that presumption is rebutted only when the record affirmatively shows otherwise. *Ressa,* 2019 IL App (2d) 170439, ¶ 31.

¶ 51    Timmer testified that she, L.R., and the others, including defendant, drank at two bars before going to Timmer's house.  At the house, the group (which included defendant) swam and played games.  L.R. testified that she was "still drinking" at Timmer's house.  Defendant admitted that L.R. was drinking at the house.  According to defendant, he played Jenga with L.R. and flirted with her several times.  From their interactions, defendant would have been keenly aware of L.R.'s intoxicated condition.

¶ 52    Further, because she was so "out of it," L.R. was helped up the stairs.  Those stairs were in the same room as the pool and the table where defendant had been playing games.  It is difficult to imagine that anyone in the pool area was unaware of L.R.'s condition in seeing her being helped up the stairs.  Critically, Timmer testified that defendant was in her upstairs bedroom when she and others, including defendant's friend Badker, helped L.R. get into the robe and go to bed. Defendant's watching L.R. being put to bed in her intoxicated condition would certainly have shown him that she was unable to knowingly consent to sex.  Indeed, as the trial court noted at the hearing on the motion for a new trial, it "[didn't] know how any person in that room couldn't have

known [that] she was unable to give knowing consent." When viewed in the light most favorable to prosecution, the evidence was clearly sufficient to prove beyond a reasonable doubt that defendant knew that L.R. was unable to knowingly consent to sex.

¶ 53     Although defendant points to his own testimony that L.R. was not so drunk that she could not consent and that she did, in fact, engage in sex voluntarily, the trial court chose to believe the State's witnesses in that regard. As discussed, that was within the unique province of the trial court. Defendant asserts that the trial court never found him incredible. However, it did so implicitly when it expressly found Timmer, L.R., and Beeman credible.

¶ 54     Lastly, defendant contends that the trial court did not follow the law because it never reached the issue of whether defendant knew that L.R. was unable to knowingly consent. As discussed, we presume that the court knew and followed the law and made all findings necessary to support a guilty finding. As pertinent here, we presume that the trial court was aware that it could not adjudge defendant guilty without finding beyond a reasonable doubt that defendant knew of L.R.'s inability to knowingly consent. That finding, while not expressed when the court adjudged defendant guilty, was implied given the evidence of defendant's knowledge and the court's presumed awareness of the rule in *Fisher* and *Whitten*. Moreover, at the hearing on the motion for a new trial, the court referenced *Fisher* and *Whitten*, expressly finding that anyone in the bedroom would have known that L.R. was incapable of knowingly consenting to sex. Of course, the evidence established that defendant *was* in the bedroom when L.R. was put to bed and thus would have known of her intoxicated condition. Public policy encourages a trial court to clarify its prior rulings and findings at a posttrial proceeding. See *People v. Marker*, 233 Ill. 2d 158, 169-70 (2009). Based on its knowledge of the law and the evidence, and its clarification at

the hearing on the motion for a new trial, the court clearly found that defendant knew that L.R. was unable to knowingly consent to sex.

¶ 55                                III. CONCLUSION

¶ 56    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 57    Affirmed.