2019 IL App (1st) 170027-U

SIXTH DIVISION
November 22, 2019

No. 1-17-0027

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| | ) | Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | 16 CR 749 |
| | ) | |
| FERNANDO ORTEGA, | ) | |
| | ) | Honorable James Michael Obbish, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Mikva and Justice Cunningham concurred in the judgment.

**ORDER**

¶ 1     *Held:*  The evidence was sufficient to sustain defendant's conviction of criminal sexual assault; and defendant's constitutional challenges to SORA are dismissed for lack of jurisdiction.

¶ 2     Following a bench trial, defendant, Fernando Ortega, appeals his conviction of criminal sexual assault. Defendant was sentenced to four years' imprisonment. On appeal, defendant contends that the evidence presented was insufficient to sustain his conviction because the State failed to prove that defendant knew the victim was unable to give knowing consent to sexual relations. Defendant also argues that the Sex Offender Registration Act (SORA) (730 ILCS

150/1 *et seq*. (West 2014)) violates substantive and procedural due process, is unconstitutionally disproportionate, and constitutes cruel and unusual punishment as applied to defendant. For the following reasons, we affirm the judgment and dismiss defendant's SORA claims for lack of jurisdiction.

¶ 3                                    BACKGROUND

¶ 4     Defendant's bench trial was held on September 28, 2016. The victim, F.R., testified first. He testified that he lived in a second-floor apartment with his wife and four children at the time of the incident. He worked in a Japanese restaurant and also prepared food for a company called Rosebud, where he worked with defendant. F.R. testified that in September 2015, he had known defendant for three years and that they were very good friends before the incident. F.R. testified that on September 10, 2015, he went out with his brother and another friend. He drank alcohol from about 9 p.m. to 5 a.m. F.R. testified that he felt very dizzy and drunk when he got home at 6:30 a.m. on September 11, 2015. He was supposed to work at Rosebud that morning, so he called defendant. F.R. testified that he told defendant he could not go to work because he was very drunk. F.R. then fell asleep without getting undressed.

¶ 5     F.R. testified that the next thing he remembered was defendant's mouth on his penis. He stated that he "kind of went back; and then [defendant] left the room rapidly." F.R. testified that he tried calling his wife, but she did not answer. F.R. stated that he was in just his boxers when he woke up, and that defendant had his shirt off and his shoes off. F.R. went out to the living room and defendant was there. F.R. testified that he asked defendant what he was doing at his house and defendant stated that F.R.'s wife had called him. F.R. then left the house and drove five blocks away, where he parked to think about things.

¶ 6     F.R. testified that he told his wife what happened the next day and they filed a police report on Monday, September 14, 2015.

¶ 7     F.R. testified that after the incident, he received text messages from defendant. Those text messages were read out loud in court. In the text messages, F.R. asked, "But tell me the truth, did you just do oral or did anything else happen. Tell me the truth." Defendant responded:

> "It was only oral and I was just starting when you saw me. That was it. Nothing else happened. And I wouldn't even have done it anyways because when I was coming out, you put my hand on your parts and that's why it happen[ed] and that was it. Nothing else.
>
> And honestly, it was just a minute."

¶ 8     F.R. then asked, "Why did you do it if I was sleeping? Why did you take off my clothes? You should have left me sleeping." Defendant responded that F.R.'s clothes smelled like alcohol and cigarettes and that his shirt was wet "like you wanted to throw up and only saliva came out of your mouth." Defendant stated that he felt bad leaving F.R. there and that he did not have bad intentions when he took F.R.'s clothing off. Defendant continued:

> "I went to your house because you asked me to go. And then, [your wife] said she was leaving and you weren't answering the phone because I called you like 10 times and you never answered me. I got really scared. I thought something else had happened. That's why I dared come into your house. And I got scared when I saw you laying on the floor. Honestly, a lot of things went through my mind at that moment but you were sleeping and that's why it was so hard to get you on to the bed.
>
> ***

3

I really hope that this does not effect [*sic*]our friendship and the mistake I made with you."

¶ 9       There were also two voicemails from defendant that were introduced into evidence. The voicemails were from defendant to F.R. and were received after F.R. spoke to the police. The first message stated in part, "You knew what I am and you knew it clearly. Don't say now that it was only a friendship." Defendant stated that he would lose his job, and that then said, "What about what I know about you? And I am not threatening you and I am not saying that but if what you are looking for is money, then let's just talk." He also stated, "[I]f you want to continue with what you are doing, that's fine also. But I am just going to tell you that I know everything about you and you know everything about me and believe me, you will lose more than me, okay." In the second voicemail, which was received the same day, defendant stated that there are a lot of people involved in a lawsuit at work and he needed to speak with F.R.

¶ 10      F.R. testified that the lawsuit defendant was referring to was a civil lawsuit he had pending against defendant and Rosebud for firing F.R.

¶ 11      On cross-examination, F.R. admitted that when they worked together at Rosebud, he would put his arms around defendant and "touch his nipples," but that they were just "playing around." When asked what other types of playing around happened, F.R. testified that he would "touch [defendant's] butt." F.R. testified that he called defendant "gordito."

¶ 12      F.R. testified that he actually quit Rosebud and then filed suit against them because they would not fire defendant. F.R. testified that he did not know defendant was gay prior to the incident. F.R. stated that he had gone to defendant's house for a party in the past, where he fell asleep in defendant's bed.

¶ 13    F.R.'s wife, Norma, testified next. She testified that she and her husband were good friends with defendant before the incident and she used to talk to defendant three times a week on the phone. She stated that defendant would come to their house two or three times a week as well.

¶ 14    Norma testified that on the morning of September 11, 2015, F.R. arrived home very drunk. Norma stated that F.R. got into bed with his clothes and shoes on and fell asleep. She then called defendant and asked if she could stay with defendant because she was angry at F.R. He told her that he would ask his cousins if Norma and her children could stay with them. She then told F.R. that she was going to breakfast with a friend.

¶ 15    Norma testified that the next night, after F.R. got home from work, he told her that defendant had performed oral sex on him. They reported it to the police on Monday. Norma testified that defendant called several times thereafter and left a voicemail for her, but that she did not speak to him.

¶ 16    Marco Cervantes Martinez testified next that he owns the building that F.R. resided in on the date in question. At around 9 a.m. on that date, defendant knocked on Martinez's window. Martinez testified that defendant was wearing a shirt with a logo on it that was similar to one he had seen F.R. wearing. Martinez testified that defendant pointed to the second floor window and then pointed to F.R.'s car. Martinez let him in.

¶ 17    Rocio Ortega, defendant's sister, testified that they lived together at the time of the incident. Ortega stated that she was friends with F.R. and his wife prior to the incident. She testified that defendant and F.R. were more than friends, F.R. had slept in defendant's bed on one occasion with defendant, and they called each other affectionate names.

¶ 18 Alberta Noyola testified that she had worked at Rosebud for 15 years and worked with both defendant and F.R. for a number of years. She testified that defendant and F.R. would grab each other's butts at work and that it "seemed to me that they were lovers." She testified that F.R. would sometimes hug defendant from behind and "grab his nipple." She testified that F.R. called defendant "Poppy."

¶ 19 Martin Rosales, defendant's cousin, also worked at Rosebud while defendant and F.R. worked there. Rosales testified that that at first defendant and F.R. were friends, but later, "I was thinking they were lovers." She testified that she thought this because at work, F.R. would "press his penis against [defendant] and say, come on, Poppy, this is for you." Rosales testified that at a birthday party in February 2015, defendant said "let's go to sleep" to F.R. and that F.R. said, "o.k." Rosales testified that F.R.'s wife was there and said they could stay together and that she is the one that closed the door.

¶ 20 Defendant testified on his own behalf. He testified that he is a homosexual and he had visited F.R.'s residence 50 to 60 times in the two years they knew each other. Defendant testified that they became more than friends in 2014. Defendant stated that at the beginning, they would touch each other secretly, but then they would hug in public and F.R. would hug him from behind, pinch his butt, and "hump" him from behind.

¶ 21 Defendant testified that on the night of the birthday party in February 2015, F.R. came to his house, and F.R.'s wife encouraged F.R. and defendant to kiss. Defendant testified that she took a picture of them kissing with her cell phone. Defendant testified that F.R. grabbed him by the hand and they went into the bedroom together. Defendant testified that F.R. put defendant's hand on F.R.'s penis, over his clothes. They then fell asleep. Defendant testified that in August 2015, he went to F.R.'s house for a party, and when defendant went to leave, F.R. "grabbed my

6

hand and he put it over his pants touching his penis. He said this is for you if you stay here to sleep."

¶ 22    Defendant further testified that on the morning of the incident, F.R. called him to say he could not go to work because he had been drinking. Defendant stated that it was not unusual for F.R. to call in saying he was too drunk to go to work, and that it had happened between 10 and 15 times over the course of two years. Defendant testified that F.R. said to him, "come over." Defendant stated that F.R. was not slurring his words. Defendant stated that Norma then called defendant and told him that F.R. had been out drinking on Fridays and Saturdays, sometimes was on drugs, and she did not want that as an example for her children. Defendant testified that Norma told defendant she wanted to move in with him.

¶ 23    Defendant testified that he then left work and went to F.R.'s house because in the past, the fights between F.R. and Norma had become physical. Defendant testified that when he got to their house, he called them 9 or 10 times, but they did not answer, so he started throwing rocks at F.R.'s window. The neighbor came to the window and eventually let him in when he saw F.R.'s car outside. Defendant testified that he knocked on the door but no one answered, so he tried the door, which was unlocked. When he went inside, he saw F.R. on the floor of his bedroom. Defendant testified that at first he was scared because he did not know what had happened. He picked F.R. up and put him on the bed. Defendant testified that F.R. stated, "oh, you came, gordito." Defendant testified that he took off F.R.'s jacket and coat because they smelled bad and were wet. Defendant testified that he put his hand on F.R.'s shoulder and told F.R. to call him later.

¶ 24    Defendant testified that F.R. then grabbed defendant's hand and put it over F.R.'s boxers and "started playing with my hand over his penis." Defendant testified that F.R. was smiling,

grabbed defendant's head, "and moved me towards his penis." Defendant stated that he then began performing oral sex on F.R. and that F.R. was "moving like somebody who was enjoying it." Defendant testified that after two or three minutes, F.R. raised his head and said, "this is not right." Defendant testified that he got up and went he went to the living room. Defendant stated that F.R. came out and asked him what he was doing there, and then got dressed and said he was going out. Defendant testified that F.R. did not slur his words.

¶ 25    The trial court made several factual findings at the end of the testimony. The trial court stated that F.R. was "passed out" and "unconscious or a state of being completely asleep or worse." The court noted that defendant lifted F.R. into bed with no assistance from F.R. The trial court found that on the date in question, F.R. "was not in any way capable of offering consent to having [defendant] place his mouth on [F.R.]'s penis. There was no consent. He was incapable of consent." Defendant was convicted of criminal sexual assault.

¶ 26    During the sentencing hearing, the trial court heard testimony in both mitigation and aggravation. The trial court stated, "This sentencing range on this particular case, it's a non-probationable offense. It's not a case where the Court has the discretion; the legislature has decided what the appropriate penalty is for this particular act." The trial court sentenced defendant to the minimum sentence of four years in jail. The State noted that based on the offense, "it is a lifetime registration requirement." The court responded:

> "All right. Defendant will have that obligation; that will be explained to him by the Department of Corrections upon his release. It's not something that the Court orders; it's a statutory order."

¶ 27    Defendant now appeals.

¶ 28                                    ANALYSIS

¶ 29    On appeal, defendant contends that the evidence presented was insufficient to sustain his conviction for criminal sexual assault because the State failed to prove that defendant knew the victim was unable to give knowing consent to sexual relations. Defendant also argues that SORA violates substantive and procedural due process, is unconstitutionally disproportionate, and constitutes cruel and unusual punishment as applied to defendant.

¶ 30                                    Sufficiency of the Evidence

¶ 31    Defendant first contends that the evidence presented was insufficient to sustain his conviction of criminal sexual assault because the State failed to prove that defendant knew that the victim was unable to give knowing consent to sexual relations.

¶ 32    When a court reviews the sufficiency of the evidence, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational tier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *People v. Jackson*, 232 Ill. 2d 246, 280 (2009). This standard of review does not allow us to substitute our judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses. *Jackson*, 232 Ill. 2d at 280-81. Reviewing courts apply this standard regardless of whether the evidence is direct or circumstantial, "and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction." *Id*. at 281. A reviewing court will not reverse a conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Campbell*, 146 Ill. 2d 363, 375 (1992).

¶ 33    To sustain a conviction for criminal sexual assault, the State must prove that the defendant committed an act of sexual penetration and "knows that the victim is unable to understand the nature of the act or is unable to give knowing consent." 720 ILCS 5/11-1.20(a)(2)

(West 2014). The act of sexual penetration is not at issue on appeal, as both parties acknowledge there was sexual penetration. Rather, defendant contends that the State failed to prove that he knew that F.R. was unable to give knowing consent. In regard to the theory of liability of "unable to give knowing consent," this court has said:

> " 'Consent' implies a willingness, voluntariness, free will, reasoned or intelligent choice, physical or moral power of acting, or an active act of concurrence (as opposed to passive assent) unclouded by fraud, duress, or mistake. [Citation.] The ability to give knowing consent should involve more than measuring complainant's IQ or ability to physically resist defendant. Knowing consent requires us to examine all of the circumstances to see if defendant knowingly exercised such control over complainant that a trier of fact could find that complainant did not submit to the sexual advances of defendant voluntarily, intelligently, and by active concurrence." *People v. Whitten*, 269 Ill. App. 3d 1037, 1044 (1995).

¶ 34    Victims in previous cases have been found unable to give knowing consent when they were highly intoxicated, unconscious, or asleep. See *People v. Vaughn*, 2011 IL App (1st) 092834, ¶¶ 38-39 (holding evidence was sufficient to support finding that victim was unable to give knowing consent where on two separate occasions she was awakened to find her father in the midst of an unbroken series of sexual assaults); *People v. Fisher*, 281 Ill. App. 3d 395, 397-403 (1996) (holding the evidence was sufficient to support a finding that the victim was unable to give knowing consent where she consumed large quantities of alcohol during the evening of the assault, and evidence showed that she was unconscious prior to and during part of the sex act).

¶ 35    Here, the evidence presented at trial shows that when defendant arrived at F.R.'s home, he called F.R. several times without answer, threw rocks at F.R.'s window without a response, and then knocked on his door without a response. Defendant found F.R. face down on his bedroom floor upon entering the room. Defendant testified that he lifted F.R. off the ground with no assistance and undressed F.R. because F.R.'s clothes were wet with vomit and alcohol. F.R.'s testimony was that he woke up to defendant performing oral sex on him, which is corroborated by defendant's text message after the incident stating, "It was only oral and I was just starting when you saw me. That was it. Nothing else happened." Presumably if defendant thought that F.R. was awake and able to give consent at the time of the act, there would be no need to tell F.R. that he was just starting to perform oral sex when F.R. saw him. Accordingly, we find that defendant has not demonstrated that the evidence, when viewed in a light most favorable to the State, was so "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Campbell*, 146 Ill. 2d at 375.

¶ 36    Defendant maintains, relying on *People v. Roldan*, 2015 IL App (1st) 131962, that he did not know F.R. was unable to consent because F.R. did not slur his words when he called defendant that morning, F.R. spoke to defendant when defendant arrived at F.R.'s home and seemed coherent, F.R. was awake and initiated sexual contact with defendant, and F.R. was able to drive immediately following the incident. In *Roldan*, however, the court held that the defendant could not have known the victim was unable to consent to the sexual acts because three witnesses testified the victim "seemed 'fine,'" did not require assistance walking, and was not slurring her words immediately prior to and after the sex act occurred. 2015 IL App (1st) 131962. In contrast here, defendant, F.R., and Norma all testified that defendant was drunk and asleep immediately prior to the incident. Defendant admitted that he had to lift F.R. off the floor

and onto the bed without assistance. F.R. testified that he woke up to defendant's mouth on his penis. While defendant claims that F.R. was awake and initiated contact, we reiterate that the trial court is in the best position to weigh the credibility of the witnesses and on review we are not allowed to substitute our judgment for that of the trial courts on questions of the credibility of the witnesses. *Jackson*, 232 Ill. 2d at 280-81. We certainly find, based on the evidence presented, that a rational trier of fact could have found that defendant knew F.R. was unable to give knowing consent to the sexual act. *Id*.

¶ 37                                                    SORA

¶ 38     Defendant claims that the requirements under SORA constitute cruel and unusual punishment in violation of the Eighth Amendment of the U.S. Constitution and constitute a disproportionate punishment in violation of the proportionate penalties clause of the Illinois Constitution. Defendant also claims that SORA violates substantive due process and defendant's right to procedural due process.

¶ 39     However, before we can reach the merits, we must first address the State's jurisdictional argument. The State contends that under recent Illinois Supreme Court precedent in *People v. Bingham*, 2018 IL 1220008, a defendant cannot raise a constitutional challenge to SORA on direct appeal from the criminal conviction that triggered the application of SORA, as defendant did here. In *Bingham*, the defendant was convicted of theft, which was the conviction on direct review, but he had a prior conviction from 1983 for attempted criminal sexual assault. *Id*. ¶ 1. While the defendant was not required to register as a sex offender at the time of the 1983 conviction, later amendments to SORA imposed a registration requirement upon his subsequent theft conviction. *Id*. ¶ 10. The defendant appealed, challenging the constitutionality of the

registration requirement as applied to him on substantive due process grounds and argued that it violated *ex post facto* principles. *Id.* ¶ 14.

¶ 40     Our supreme court found that it lacked jurisdiction to address the defendant's constitutional claims on the merits because "[a] notice of appeal confers jurisdiction on an appellate court to consider only the judgments or parts of judgments specified in the notice." (Emphasis and internal quotation marks omitted). *Id.* ¶ 16. Citing Illinois Supreme Court Rule 615(b) (eff. Jan. 1, 1967), the court noted that "the scope of appellate review is defined by the trial court's judgment and the proceedings and orders related to it." *Id.* Rule 615(b) states that a reviewing court may:

> "(1) reverse, affirm, or modify the judgment or order from which the appeal is taken;
>
> (2) set aside, affirm, or modify any or all of the proceedings subsequent to or dependent upon the judgment or order from which the appeal is taken;
>
> (3) reduce the degree of the offense of which the appellant was convicted;
>
> (4) reduce the punishment imposed by the trial court; or
>
> (5) order a new trial." Ill. S. Ct. R. 615(b) (eff. Jan. 1, 1967).

¶ 41     The court in *Bingham* found that because the requirement to register under SORA was not encompassed within the trial court's judgment of guilt on the theft conviction or any order of the trial court in that proceeding, nor could the requirement that the defendant register be characterized as a "proceeding," the constitutional challenge asked the reviewing court to take action not available to it under Rule 615(b). *Bingham*, 2018 IL 122008, ¶ 17. The court stated:

> "[A] reviewing court has no power on direct appeal of a criminal conviction to
> order that defendant be relieved of the obligation to register as a sex offender

when there is neither an obligation to register imposed by the trial court nor an order or conviction that the defendant is appealing that is directly related to the obligation or the failure to register." *Id.* ¶ 18.

¶ 42 The court then specified that challenges to SORA's constitutionality may instead be pursued: (1) on direct appeal in a case finding a defendant guilty of violating a SORA requirement; or (2) by pursuing a constitutional claim in a civil suit. *Id.* ¶ 21.

¶ 43 Defendant attempts to distinguish *Bingham* by arguing that the defendant in *Bingham* was not appealing from a sex offense conviction, while defendant here was appealing from a sex offense conviction that directly required registration under SORA. This argument has been rejected several times. See *People v. Wells*, 2019 IL App (1st) 163247, ¶¶ 45-52; *People v. Christian*, 2019 IL App (1st) 153155, ¶¶ 9-17; *People v. McArthur*, 2019 IL App (1st) 150626-B, ¶¶ 42-46; and *People v. Denis*, 2018 IL App (1st) 151892, ¶¶ 96-100.

¶ 44 Defendant also contends, relying on *People v. Rodriguez*, 2019 IL App (1st) 151938-B, ¶ 10, that because the trial court told defendant he would be subject to lifetime sex offender registration as a result of his conviction, this court has jurisdiction to hear defendant's SORA arguments. We disagree. In *Rodriguez*, the defendant was found not guilty of aggravated criminal sexual assault on the basis of unfitness, but this court reversed. 2019 IL App (1st) 151938-B, ¶ 1. On remand, the trial court stated on the record that the defendant must register under SORA within three days, and he appealed that ruling, challenging the constitutionality of SORA both on its face and as applied to him. This court affirmed and the defendant petitioned for leave to appeal to the supreme court. *Id.* ¶ 2. The Illinois Supreme Court denied the defendant's petition for leave to appeal, but issued a supervisory order directing this court to vacate the judgment and reconsider the decision in light of *Bingham*. *Id.* This court vacated the

prior judgment and again affirmed, finding *Bingham* inapposite. *Id.* Specifically, this court noted that what distinguished that case from *Bingham* was that at the hearing on remand, "the court did order [the defendant] to register under SORA within three days and it was this order from which [the defendant] appealed." *Id.* ¶ 10. This court noted that unlike *Bingham*, "in which the requirement that the defendant register as a sex offender arose by operation of law and was not reflected in either the court's written or oral judgment [citation], here, the court explicitly made an oral pronouncement that [the defendant] must register as a sex offender." *Id.*

¶ 45   In the case at bar, during the sentencing hearing, the State noted that "based on the offense, it is a lifetime registration requirement." The trial court responded:

> "All right [*sic*]. Defendant will have that obligation; that will be explained to him
> by the Department of Corrections upon his release. It's not something that the
> Court orders; it's a statutory order."

¶ 46   As can be seen from this colloquy, the trial court specifically noted that registration was not a court order and that it would be explained to him upon his release from prison, as it arose by operation of law. This is certainly inapposite to the circumstances in *Rodriguez,* where the trial court specifically ordered the defendant to register within three days. Accordingly, we dismiss defendant's constitutional challenges to SORA for lack of jurisdiction.

¶ 47                                    CONCLUSION

¶ 48   For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 49   Affirmed.

15