2024 IL App (1st) 221750-U

No. 1-22-1750

Order filed March 14, 2024

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 801 |
| | ) | |
| GABRIEL DATHEY, | ) | Honorable |
| | ) | Michael Clancy, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Martin and Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for criminal sexual assault is affirmed over his contentions that the State failed to prove beyond a reasonable doubt both that he penetrated the victim's anus and that he knew she was unable to consent, and that the trial court abused its discretion in granting the State's motion to admit other-crimes evidence.

¶ 2    Following a bench trial, defendant Gabriel Dathey was convicted of one count of criminal sexual assault (720 ILCS 5/11-1.20(a)(2) (West 2012)) and sentenced to four years in prison. On appeal, defendant challenges the sufficiency of the evidence to convict, arguing that the State failed to prove both penetration of the victim's anus and that he knew the victim was unable to consent.

He also contends that the trial court abused its discretion in granting the State's motion to admit other-crimes evidence. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant's conviction arose from the events of February 24, 2012. Following arrest, defendant was charged by indictment with two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(2) (West 2012)) and two counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(4) (West 2012)). The indictment alleged that he knowingly committed acts of sexual penetration upon N.M., knowing she was unable to give knowing consent. Count I specified the penetration as contact between defendant's penis and N.M.'s "sex organ," while count II specified the penetration as contact between defendant's penis and N.M.'s "anus." Counts III and IV mirrored the first two counts, adding an allegation that the respective act of penetration was perpetuated during the course of the commission of another felony, *i.e.*, kidnapping.

¶ 5                        A. Motion to Allow Other-Crimes Evidence

¶ 6      Prior to trial, the State filed a motion to allow other-crimes evidence pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2018)). The State's motion identified three prior incidents. Relevant here, the State alleged in its motion that on September 29, 2002, defendant sexually assaulted L.B., a college student, near her Chicago residence hall. The State alleged that L.B. had gone to a local bar with rugby teammates and became extremely intoxicated. She "stumbled" home alone but was too inebriated to open the door to her dormitory. As she unsuccessfully attempted to use her ID card to gain entry, defendant, whom she did not know, appeared and led her to a bench a few feet away. He pushed her to the ground, got on top of her, forced his hand into her pants, and tried to force his finger into her

vagina. He then put on a condom and "began to rape L.B.," stopping when the condom broke. After asking L.B. whether she was on birth control, he fled. L.B. vomited numerous times overnight and felt too sick and intoxicated to walk. The next morning, she reported the incident. The police recovered a condom near the bench, and, in 2017, DNA from the condom was linked to defendant.

¶ 7    The State alleged in the motion that, in the instant case, N.M. was at a Chicago nightclub when defendant introduced himself to her and then bought her two drinks. Her memory "started to get fuzzy" and she felt unlike any other time she had felt when drinking alcohol. The next thing she remembered was waking up in a car defendant was driving. Between blackouts, she remembered waking up in her bed, naked from the waist down, with defendant on top of her. Although N.M. told defendant to stop and said she was sick, he rubbed his penis against her inner thigh. N.M. recalled vomiting numerous times before blacking out again. When she woke hours later, defendant "walked out and said goodbye as if nothing happened." Feeling that she had been drugged and raped, N.M. sent defendant a text message asking if there had been a sexual encounter. Defendant responded that they only kissed. N.M. went to the hospital where a sexual assault kit was administered. Semen was identified in her vaginal and anal swabs and, eventually, defendant's DNA was linked to her case.

¶ 8    The State argued in its motion that the other-crimes evidence was admissible under section 115-7.3 of the Code to prove defendant's propensity to commit sexual assaults. The State asserted that the incidents involving L.B. and N.M. were proximate in time and factually similar, and that "other facts and circumstances" weighed in favor of admission in that the other-crimes evidence would show N.M.'s assault was not an isolated incident, speak to N.M.'s credibility, and rebut the

defense of consent. The State further argued that the other-crimes evidence was admissible to prove motive, intent, identity, lack of consent, and *modus operandi*.

¶ 9     At the hearing on the motion, defense counsel argued that L.B.'s case had no similarities to N.M.'s, contested the fact pattern presented by the State regarding L.B.'s case, and asserted that the cases were not proximate in time but, rather, occurred almost 10 years apart. Counsel further argued that the prejudice in admitting the other-crimes evidence would be "tremendous."

¶ 10    The trial court ruled on the State's motion as follows:

"All right. As to the State's motion to admit evidence of other crimes to show lack of consent, absence of mistake, intent and propensity to commit nonconsensual sex, it's going to be granted as to [L.B.'s case and another case].

As to the request to admit those, as to the request to admit [the other case] as *modus operandi*, that will be denied. I don't think there's enough similarity.

The issue in the case clearly is consent. As you point out, there are issues, if you like, with each case. But as the State points out, there's enough similarity to show the lack of consent, absence of mistake and intent, I think, and I'm sure I think way more prejudicial—it's way more probative rather than it is prejudicial to the defendant in this case. So I shouldn't say it's unfair but prejudicial. That's what I should say."

¶ 11                                B. Trial

¶ 12    At trial, N.M. testified that in 2012, she was 21 years old and lived with a roommate, Patricia Korbackova, in a Chicago apartment. On the night in question, N.M. met a coworker, Ricardo, at his home and had "a few" drinks. N.M. and Ricardo then went to a Chicago nightclub,

Berlin, to meet a group of Ricardo's friends. Among the group was Patrick Wedge, whom N.M. met for the first time that night.

¶ 13     While at Berlin, a man named Gabe offered to buy N.M. a drink.[1] She accepted the drink, a cranberry vodka. N.M. thought Gabe, who was "very kind" and "very nice," was gay. They danced a little and chatted a little. About 30 minutes to an hour after having a second drink, which Gabe had handed to her, N.M. started to feel like she never had before or since. She described the sensation as follows: "It almost feels like you can't feel your body. You are just kind of floating. You get very sick, confused, unsure where you are going or who is even around you, and just vomiting, and blacking out, coming back, blacking out sick, coming back again, and yeah."

¶ 14     N.M. clarified that she did not vomit at Berlin. At some point, she left the nightclub. When asked whether she wanted to leave, she answered, "I don't know. Like I said it's just you don't know where you are, who you are with, you can't feel your body, that kind of experience I felt when I was leaving the nightclub." N.M. did not recall getting into a vehicle but remembered an "image *** looking towards Gabe in a car." During the ride to her apartment, she was "kind of a little bit in and out." She vaguely remembered stumbling into her home with her clothes "messed up."

¶ 15     The next image in N.M.'s memory was Gabe rubbing his penis on her thigh and her telling him to stop because she was very sick. She clarified in court that "[i]t was a very dizzy confusing sick" and she "felt like [she] was dying." When asked whether she had vomited before that point, she answered, "I'm not sure. I don't know."

---

[1] N.M. did not identify defendant in court.

¶ 16    N.M. testified that, after telling Gabe to stop, she remembered "[m]ore vomiting." When she next woke, she was lying at the foot of her bed "like how a dog lays," naked from the waist down. Gabe was in the bed "up front," but she did not realize he was there until he started tossing and turning. N.M. threw up on the floor. She then went upstairs, where she threw up again, and spoke with Korbackova. Shortly thereafter, Gabe gathered his belongings, said goodbye, gave her his phone number, and left.

¶ 17    N.M. testified that she threw up "[a]ll over" her apartment and was "dry-heaving a lot." She took a shower, explaining, "I was recalculating the night, and I did a self-examination and as woman you can tell if you just been recently penetrated. So it felt very looser than usual down there and that really scared me to call the police." Korbackova called the police for her. When they arrived, N.M. related what happened and had them call an ambulance to take her to the hospital. There, personnel administered a sexual assault kit.

¶ 18    In 2017, N.M. received a phone call from a detective regarding her case. N.M. met with the detective and viewed a photo array but was unable to identify anyone. Finally, when asked whether she had agreed to have "any sexual relationships" with defendant, she said she did not.

¶ 19    On cross-examination, N.M. stated that she "did not agree to have sex with" defendant. She said she texted him "the next day," asking whether they had sex. He responded, "LOL, no, we just kissed." N.M. acknowledged that she no longer had access to that message, even though she had asked whether it "could have been pulled up." She asserted that she mentioned the text message to the police and to hospital personnel. She did not recall whether she showed the text to anyone at the hospital. She also did not remember at what point in the night Gabe gave her his phone number.

¶ 20    N.M. agreed that she was "buzzed" before she arrived at Berlin. She acknowledged that before going to Berlin, she smoked marijuana and, "[m]aybe *** definitely before" going to the nightclub, took Adderall, which she had been prescribed in the past. When asked whether she was "pretty drunk" before Gabe bought her two drinks, she answered, "I don't know." She also did not know how many drinks she had at Berlin other than the two cranberry vodkas Gabe bought for her. N.M. clarified that she went up to the bar with Gabe when he bought her the first drink, which she received directly from the bartender, but that Gabe brought her the second drink and handed it to her.

¶ 21    N.M. did not remember whether she told her friends she was leaving Berlin or whether she agreed to have Gabe take her home. She recalled that, when she was walking into her apartment, she was stumbling around and one of her breasts came out of her outfit. She also remembered that Korbackova was in the living room. Korbackova did not stop her and defendant but, rather, went back to her room "[j]ust to kind of leave us alone I guess." When asked whether Korbackova would have helped her out if she were in danger, N.M. answered, "If I was in danger, yes. But Gabe, like I said, he had a persona. He was very friendly, very kind, very nonthreatening type of guy. So I believe that she believed that at that time that I was not in danger[.]"

¶ 22    When asked about vomiting, N.M. clarified that she "remember[ed] visions of puking, waking and puking. It was consistent dry-heaving probably for the whole night." She clarified that when defendant was rubbing his penis on her leg, her leg was bare, even though she had worn pants to Berlin.

¶ 23    On redirect examination, N.M. stated that although she had smoked marijuana in the past, she did not remember whether she smoked marijuana the night she went to Berlin.

¶ 24    Patrick Wedge testified that on the night in question, he went to Berlin with a coworker, Ricardo Muniz. There, he met N.M. and "clicked" with her right away. They spent the majority of the evening talking with each other. Although there was a span of "a couple of hours" when he did not see N.M., Wedge saw her again when he was exiting the nightclub. Wedge had had two to four drinks over the course of the night and was not heavily intoxicated. He did not know how many drinks N.M. had. He described her as "pretty even keel" until the end of the night, when she became heavily intoxicated. He stated that her speech was slurred, her eyes "were starting to go," and she looked "mopey."

¶ 25    Wedge testified that when he left Berlin, he saw N.M. in a taxi, lying across the back seat. Her eyes were rolled back, she was "slobbering" out the side of her mouth, and she "was just clearly completely out of it." A man who had introduced himself as "Angel" was in the front seat of the taxi. Wedge described him as "really a nice guy" whose demeanor made him feel comforted and assured. Angel told Wedge that "he was here to take care of her and he was going to make sure that she was taken home safe." Angel and N.M. then left in the car.

¶ 26    When Wedge got back to Muniz's residence, he began to have a bad feeling that caused him to worry about N.M. He called her about 10 times but could not reach her, and then called the police and a few hospitals, trying to find her. Wedge received a phone call from N.M. the next afternoon. She was upset, confused, and "frazzled," and was looking for answers as to what had happened.

¶ 27    In December 2017, Wedge received a call from a Chicago detective. In court, Wedge pointed out defendant and stated, "That does look like the gentleman I saw that night. That does

look like him, yes." The court determined that the record would not reflect an in-court identification.

¶ 28    On cross-examination, Wedge stated that he did not know if N.M. had any drinks at Berlin and that he had "pretty level conversation" with her the whole night. When asked whether he told the police or the State's Attorney that N.M. had been "drooling," he answered that it "may have got lost in translation, but I'm putting that on record today." When asked whether he was sure the man N.M. left Berlin with said his name was Angel, as opposed to Gabe, Wedge answered, "Well, I believe so. He could have said Gabriel and maybe I associated it with Angel because Gabriel and Angel go hand in hand. What I remember is Angel. *** It was either Gabriel or Angel. I remember Angel. That's what my memory serves me." Wedge also stated that he had a vague memory of meeting the man inside Berlin earlier in the night, but was not 100% sure, and that, while he believed the car the man was driving was a taxi, it may have been an Uber or another ride share.

¶ 29    Chicago paramedic Elizabeth Kirk testified that she was dispatched to N.M.'s residence at 5:21 p.m. on February 24, 2012. N.M.'s heart rate was irregular and slightly elevated, and she appeared very anxious.

¶ 30    Julia Busta, a registered nurse who examined N.M. at the hospital, testified that she was certified as a Sexual Assault Nurse Examiner (SANE) at that time and had performed hundreds of sexual assault examinations over the course of her career. When she met N.M. around 6:45 p.m., she explained to her the process of conducting a sexual assault kit and obtained her consent to do so. As part of the kit, Busta wrote down N.M.'s report of what led her to come to the hospital. N.M. told Busta she had gone to Berlin with a coworker the night before and met a man who bought her a drink. After the second drink she felt drugged. She then remembered "driving home,

being in auto, coming to [her] apartment with Gabriel," and vomiting nonstop. N.M. said she awakened to Gabriel rubbing his penis on her leg. N.M. told him to stop and that she was sick. She then blacked out. N.M. told Busta that Gabriel was in her bed and she did not remember removing her pants and underpants. She later texted Gabriel to ask if they had sex and he wrote back that they kissed.

¶ 31    N.M. told Busta that before coming to the hospital, she had urinated, showered, wiped and washed her genitals, vomited, and changed her clothes. Busta collected N.M.'s underpants and then conducted a complete physical examination "from head to toe," collecting evidence as she did so. Among other things, she swabbed N.M.'s labia, vaginal vault, and anus. Relevant here, she specifically "move[d] the q-tip around the opening of the anus and around the tissue around the anus." She did not observe any physical injuries to N.M.'s body other than a small abrasion on her right elbow. Busta's findings were "sexual assault exam findings consistent with the patient's version of events."

¶ 32    On cross-examination, Busta testified that it was common, "more often than not," that there will be no signs of trauma with sexual assaults. She stated that she did not recall whether N.M. told her about any pain during her examination. She agreed that nothing was documented showing that N.M. complained "that she had pain or she felt like she was anally penetrated." N.M. told Busta that she was unsure whether defendant had penetrated her vagina and anus. Busta agreed that the swab looks like "a q-tip with a long handle."

¶ 33    She explained how anal and vaginal swabs are conducted as follows:

"A. Collecting an anal swab is done by first examining the anus, you spread apart the folds of the tissue surrounding the anus and then there is like a it's almost—I don't

know the terminology but there is like a neck portion, excuse me, of [the] anus. You use some sterile saline and you swab right at the neck entrance of the anus and around in the folds.

Q. And for the vaginal swab, how do you swab it?

A. For the vaginal swab, the vaginal swab in my practice is done in what I would determine—what I would call a blind swab. I take the swabs, insert them into the vaginal canal and in circular motion swab and then remove.

Q. So the difference between an anal swab and a vaginal swab is in a vaginal swab you go into the vagina to the canal and in an anal swab you go on the rim outside?

A. That's correct."

¶ 34    The parties stipulated that, if called as a witness, Kenan Hasanbegovic, a forensic scientist with the Illinois State Police, would have testified that, in 2012, he processed a criminal sexual assault evidence collection kit containing vaginal, anal, and oral swabs collected from N.M. Examination of the swabs indicated the presence of semen on the vaginal and anal swabs, but not the oral swabs. No sperm cells were observed on the microscope slide prepared with a portion of the vaginal swabs. The vaginal and anal swabs were preserved for future DNA analysis.

¶ 35    The parties stipulated that, if called as a witness, Meredith Misker, a forensic scientist with the Illinois State Police, would have testified that in 2014, she was assigned to analyze evidence in N.M.'s case. Testing revealed male DNA on the vaginal swabs, but a DNA profile could not be detected due to the ratio of female DNA to male DNA being "too high." DNA analysis conducted on the "sperm fraction" of the anal swabs resulted in the identification of a partial male DNA profile. Analysis of the "mixed fraction" of the anal swabs resulted in the identification of a

complete male DNA profile which was consistent with having originated from the same male donor from the sperm fraction of the anal swabs.

¶ 36    Misker would have further testified that the complete male DNA profile was searched in a database. The search detected an association to a male DNA profile identified in a 2002 case where a condom was submitted by Chicago police in a case involving a victim named L.B.

¶ 37    Chicago police detective Jacquelin Mok testified that in 2016, she collected a buccal swab from defendant. The parties stipulated that the swab was sent to the Illinois State Police Crime Laboratory for analysis.

¶ 38    Angela Kaeshamer, a forensic scientist with the Illinois State Police whom the court qualified as an expert in forensic DNA analysis, testified that she developed a full DNA profile suitable for comparison from defendant's buccal swab. She then compared that profile with the male profiles generated from N.M.'s anal swabs. Kaeshamer testified that the results of her comparison were that defendant could not be excluded from having contributed to the male profile identified in the sperm fraction of the anal swabs, and could not be excluded from having contributed to the male profile identified in the mixed fraction of the anal swabs. She specified that approximately 1 in 9.7 million unrelated Black individuals could not have been excluded from having contributed to the sperm fraction and approximately 1 in 43 quadrillion unrelated Black individuals could not have been excluded from having contributed to the mixed fraction.

¶ 39    Kaeshamer also compared defendant's DNA profile with a DNA profile generated from swabs taken from the interior and exterior of a condom that was inventoried in L.B.'s case. Defendant could not be excluded from contributing to the male DNA profile identified on the interior and exterior sperm fractions of the condom swabs. Kaeshamer specified that

approximately 1 in 120 trillion unrelated Black individuals could not have been excluded from that profile.

¶ 40    On cross-examination, Kaeshamer acknowledged that she did not know how semen "got to" N.M.'s anal area. She agreed that it could have been through wearing underwear, but stated, "It's a possibility, but probably unlikely." She also agreed that it could have happened by someone ejaculating on the area or from "leaking" from a different area of the body, and agreed with counsel's statement that "[i]t does not have to mean that there was actual contact between a penis and an anus for the sperm to get there."

¶ 41    Proof of other crimes witness, L.B., testified that, on September 28, 2002, she was a freshman at a Chicago university. That night, she went to a neighborhood bar with rugby teammates. While at the bar, she drank alcohol but did not pay for the drinks herself. Teammates bought pitchers of beer, "some gentlemen at the bar" bought beer for the team, and a man or men purchased her two shots of tequila. L.B. was "heavily intoxicated or kind of out of it."

¶ 42    L.B. had no recollection of leaving the bar or walking home to her dormitory. In court, she described herself as "essentially blackout drunk." Her next memory was attempting to use her "swipe card" to enter the building. While she was doing so, a man L.B. had never seen before appeared, grabbed both of her hands, and said, "[L]et's go over here." He led L.B. to a nearby bench in an area that was not well-lit, sat her on the bench, and kissed her. He put his hand down her pants and touched the outside of her vagina. He then laid her on the ground, pulled her pants and underwear down around her knees, got on top of her, and attempted to have intercourse with her. L.B. felt pressure at the opening of her vagina but explained that she was wearing a tampon at the time, so the man was "having difficulty actually achieving full sexual congress." The next

thing L.B. recalled was the man telling her that his condom broke and asking her if she was "on the pill." L.B. told him she was not. The man walked away and L.B. pulled up her pants. When asked in court whether she consented to the man's actions, she said she did not and explained that while she remembered pulling her pants up, she did not actually remember the man pulling them down.

¶ 43    L.B. got up and used her swipe card to enter the dormitory building. She was having difficulty standing up but was able to take the elevator to the floor where she lived. After she exited the elevator, she collapsed to the floor. She crawled down the hallway, vomiting along the way. As she approached her room, she felt her arms and legs "giving out" and ended up having to "army crawl" with her elbows to her room. Once there, she vomited "over and over and over and over again" for hours and showered in her clothes.

¶ 44    In the morning, L.B. woke to find herself in her bed, amid "piles" of vomit and vomit trailing down her face, although she had no recollection of getting into the top bunk or vomiting while she was there. She reported the incident to a resident assistant and then spoke with the campus police. A condom and condom wrapper were found by the bench. Finally, L.B. testified that she had never felt her body "give out like that" or "just fully shutting down" any time before or since that night, even when she had been drinking heavily.

¶ 45    On cross-examination, L.B. testified that "the next day," she went to the hospital, where a sexual assault kit was administered. Afterwards, she spoke to two detectives in an interview room at the hospital. According to L.B., they "were essentially shouting at me for drinking underage and not taking any notes." L.B. denied telling the detectives that she agreed to kiss the man on the bench.

¶ 46    Defense counsel made a motion for a directed finding. He argued, in relevant part, that the State had not proved contact, however slight, between defendant's penis and N.M.'s "sex organ" or "anus." He further argued that the State had not proved that, if there was contact, it was not consensual, or that defendant knew at the time that N.M. could not consent. The trial court denied the motion.

¶ 47    Defendant did not testify or present any evidence.

¶ 48    In closing, the State argued it had proved all four charges. Defense counsel adopted his arguments from the motion for a directed finding, adding, *inter alia*, arguments that the State had only presented circumstantial evidence of penetration, and that L.B.'s testimony was "not propensity."

¶ 49    The trial court found defendant guilty of criminal sexual assault premised on contact between his penis and N.M.'s anus (count II) and acquitted him of the other three charges. In the course of explaining its guilty finding on count II, the court reviewed the facts of the case. Relevant here, the court noted that it had considered N.M.'s testimony that, after consuming the second drink from defendant, she felt strange, was blacking out, and was in and out of consciousness during the ride to her apartment. The court considered that N.M. remembered stumbling into her apartment, her breast falling out of her clothing, and telling defendant to stop because she was sick when he rubbed his penis on her bare thigh. The court considered that N.M. remembered vomiting in several locations in her apartment throughout the night, stating as follows:

> "While mindful that the evidence is not established the sequence of vomiting relative to the sexual activity, it's still highly relevant. That the vomiting occurred prior to the sexual activity. Clearly the defendant would be on notice of the victim's severe

impairment and an inability to give consent. However, even if the multiple accounts of vomiting occurred after the sexual encounter, it's still relevant as it supports that the victim was severely impaired or intoxicated when leaving the club and when at her apartment. The multiple occasion[s] of vomiting support the conclusion that the victim was severely impaired and intoxicated.

The victim's inability to recall multiple periods of time during the evening and early morning hours including and inability to recall being sexually penetrated supports severe impairment and intoxication."

The court also considered N.M.'s testimony that she did not agree to have sex with defendant and that when she asked him whether they had sex, he lied about their sexual encounter, texting, "LOL, no, we just kissed." The trial court stated that it found N.M. credible and truthful throughout her testimony.

¶ 50    The court further stated it found Wedge's testimony to be relevant regarding N.M.'s severe impaired condition at the time she left Berlin.

¶ 51    The court then noted that L.B.'s other-crimes testimony was admitted to show lack of consent, absence of mistake, intent, and propensity to commit nonconsensual sex, but not *modus operandi*. The court stated it was mindful that the incident concerning L.B. took place approximately nine and a half years prior to N.M.'s case. It was also mindful of dissimilarities between the two cases, including that, in L.B.'s case, there was no contact between L.B. and defendant prior to the sexual incident and the assault took place outside. The court reviewed the facts of L.B.'s case, including that she had been drinking heavily at a bar, described herself as "blackout drunk" at the time she left the bar to walk home, that she did not consent to having sex

with defendant, and that she eventually had to crawl to her dorm room and vomited numerous times. The court stated it found the incident involving L.B. relevant to the issue of consent.

¶ 52    The court concluded that it was clear from the three witnesses' testimony that defendant did not "require, need or look for consent," but, rather, "looks for the opportunity that heavily intoxicated and impaired women provide for him to easily and without much effort sexually assault them." Based on the testimony, the court found N.M. was unable to give consent to the act of sexual penetration due to her severe impairment and that defendant knew N.M. was unable to give consent.

¶ 53    With regard to the issue of penetration, the court noted that there was no requirement of "anal or rectal intrusion," but, rather, "any contact however slight between the sex organ of one person and the anus of another person." The court noted that Busta, the nurse who administered the sexual assault kit at the hospital, swabbed the outside rim of N.M.'s anus, moving the swab around the anal opening and folds. The court further noted that defendant could not be excluded from having contributed to the male DNA profile generated from testing of the anal swabs.

¶ 54    The court concluded its findings as follows:

> "I find that the direct and circumstantial evidence has established that [defendant] committed an act of sexual penetration on [N.M.]. Specifically, any contact however slight between [defendant's] penis and [N.M.'s] anus.
>
> I find that based on [defendant's]—I find that based on [defendant's] opportunity to observe [N.M.'s] impaired condition for a lengthy period—lengthy and extended period of time at Berlin, during the drive to the victim's apartment, at the victim's apartment, and in her bedroom that he knew she was unable to give consent.

I find that the State has proven beyond a reasonable doubt that [defendant] knowingly committed an act of sexual penetration on [N.M.], contact however slight between [defendant's] penis and [N.M.'s] anus knowing that [N.M.] was unable to give consent."

¶ 55    Defendant filed a motion for judgment of acquittal or a new trial, arguing, among other things, that the State had failed to prove him guilty beyond a reasonable doubt and that the court had erred in admitting evidence of L.B.'s allegations. With regard to the sufficiency of the evidence, defendant contended that the State had not proved "actual contact" between his penis and N.M.'s anus, but, rather, had only offered pure speculation. As to the other-crimes evidence, defendant contended that the incident involving L.B. was not proximate in time, was factually dissimilar to N.M.'s case, and had not been proven.

¶ 56    Following a hearing, the trial court denied the motion. The court stated that it had made reasonable inferences based on the evidence in determining that the State had proved the element of penetration. The court also found that the pretrial ruling allowing other-crimes evidence was appropriate.

¶ 57    The trial court subsequently sentenced defendant to four years in prison. Defendant filed a timely notice of appeal.

¶ 58                                    II. ANALYSIS

¶ 59                          A. Sufficiency of the Evidence

¶ 60    On appeal, defendant first challenges the sufficiency of the evidence to convict.

¶ 61    When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). It is the responsibility of the trier of fact to determine the credibility of the witnesses and the weight to be given their testimony, to resolve any conflicts in the evidence, and to draw reasonable inferences from the evidence, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Gray*, 2017 IL 120958, ¶ 35. Reversal is justified only where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt (*People v. Slim*, 127 Ill. 2d 302, 307 (1989)) or where proof of an element of a crime is wholly lacking (*People v. Sweigart*, 2021 IL App (2d) 180543, ¶ 56).

¶ 62    A person commits criminal sexual assault, as charged in this case, if he "commits an act of sexual penetration" and "knows that the victim is *** unable to give knowing consent." 720 ILCS 5/11-1.20(a)(2) (West 2012). "Sexual penetration" means "any contact, however slight." 720 ILCS 5/11-0.1 (West 2012). To establish penetration for purposes of criminal sexual assault, the State must prove "actual contact" between a defendant's sex organ and the sex organ or anus of the victim; evidence of touching "an area near the complainant's sex organ or anus is insufficient." *People v. Atherton*, 406 Ill. App. 3d 598, 609 (2010). "Consent" means "a freely given agreement to the act of sexual penetration or sexual conduct in question." 720 ILCS 5/11-1.70(a) (West 2012).

¶ 63                                    1. *Sexual Penetration*

¶ 64    The trial court found defendant guilty on count II, which charged defendant with sexual penetration of N.M.'s anus with his penis.

¶ 65    Defendant first contends that the State failed to prove the element of penetration where it did not establish "actual contact" between his penis and N.M.'s anus. He maintains that the

presence of semen near, but not inside, N.M.'s anus is not evidence of penetration, and that proof of contact "around" or "near" N.M.'s anus is insufficient to sustain his conviction. He argues that Busta's explanation of how she performed the anal swab failed to prove anything other than that semen was found near N.M.'s anus. He asserts that Busta's testimony:

> "clearly shows she swabbed on the anus, on the neck portion of the anus, 'the tissue around the anus,' and the [*sic*] around the folds. It, therefore, cannot even be determined whether the semen found on that swab was recovered from N.M.'s anus, as required, or the areas near her anus or the butt cheeks folds. Consequently, [defendant's] semen found on the swab cannot be accepted as proof beyond a reasonable doubt that his penis made any contact with N.M.'s anus."

¶ 66    Defendant further notes that Kaeshamer, the State's DNA expert, agreed semen could have arrived at N.M.'s anal area by N.M. wearing underwear, by someone ejaculating on that area, or from semen leaking from a different part of N.M.'s body. He argues that the evidence from the swab only proves, at most, that his semen was transferred to N.M.'s body after it was discharged from his penis. He maintains that this transfer could have occurred in "endless ways," for example, from N.M.'s sheets, or from her hand when she performed a self-examination in the shower, or if his penis "just hover[ed] around the area of N.M.'s anus when he ejaculated," and that the trial court should have found the anal swab to be of limited evidentiary value because the State failed to present evidence negating the possibility of another method of transfer. Defendant maintains that the trial court's conclusion that the transfer occurred via actual contact was pure speculation.

¶ 67    Statutorily, "sexual penetration" means "any contact, however slight." 720 ILCS 5/11-0.1 (West 2012). As noted above, penetration for purposes of criminal sexual assault requires proof of

"actual contact" between a defendant's sex organ and the sex organ or anus of the victim, and evidence of touching "an area near the complainant's sex organ or anus is insufficient." *Atherton*, 406 Ill. App. 3d at 609. Whether sexual penetration occurred is a question of fact to be determined by the trier of fact. *People v. Janusz*, 2020 IL App (2d) 190017, ¶ 71. "The trier of fact is entitled to draw all reasonable inferences from both circumstantial and direct evidence, including an inference of penetration." *People v. Hillier*, 392 Ill. App. 3d 66, 69 (2009). An inference of penetration is unreasonable only if the victim denies that penetration occurred. *Id.*

¶ 68    After reviewing the record, we find that the trial court could reasonably infer that penetration occurred. First, N.M. did not deny that defendant penetrated her anus. Rather, she testified that defendant rubbed his penis on her thigh and that the next morning she found that her pants and underwear were removed and could tell she had "just been recently penetrated." Although she did not specify the penetration, *i.e.*, contact, occurred to her anus, the State's evidence showed the presence of semen, sperm, and defendant's DNA on the anal swabs taken from N.M. during the sexual assault evidence collection examination. We find that a reasonable inference from this evidence is that there was contact, however slight, between defendant's penis and N.M.'s anus. See *People v. Hills*, 2021 IL App (4th) 200220-U, ¶ 37 (finding a reasonable inference of contact between the victim's anus and the defendant's penis where an anal swab contained the defendant's DNA); Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023) (nonprecedential orders entered on or after January 1, 2021, may be cited for persuasive purposes); see also *People v. Betance-Lopez*, 2015 IL App (2d) 130521, ¶¶ 42-46 (finding a reasonable inference of contact between the victim's anus and the defendant's penis where the defendant admitted to contact

"around the rim" and a swab of the "external and internal parts of the anus" tested positive for semen).

¶ 69    In reaching this conclusion, we reject defendant's argument that Busta's testimony regarding how she conducted the anal swabs cannot lead to a conclusion that his DNA was present on N.M.'s anus, as opposed to an area "near" her anus. Busta is a registered nurse and, at the time of her examination of N.M., was a certified SANE and had performed hundreds of sexual assault examinations. There is no evidence demonstrating that she performed the swab tests here incorrectly. On cross-examination, Busta specifically explained that an anal swab is conducted by spreading apart the folds of the tissue surrounding the anus and swabbing "right at the neck entrance of the anus and around in the folds." She also agreed that when conducting an anal swab, "you go on the rim." When describing how she performed the anal swab on N.M., Busta testified that she moved the swab, described as a q-tip with a long handle, "around the opening of the anus and around the tissue around the anus." The anus is defined as the "opening of the rectum to the outside of the body." *Anus*, NIH National Cancer Institute, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/anus (last viewed Mar. 6, 2024). Contrary to defendant's argument, we find that the trial court could have reasonably determined from Busta's testimony that she swabbed the anus, not "the areas near her anus or the butt cheeks folds," as defendant suggests. See *Hills*, 2021 IL App (4th) 200220-U, ¶ 39 (finding the jury could have reasonably inferred that a nurse's testimony that she collected an "anal swab" meant that she collected a swab from the victim's anus); Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023) (nonprecedential orders entered on or after January 1, 2021, may be cited for persuasive purposes).

¶ 70     Moreover, we note that the case defendant has cited for the proposition that "semen found near, but not inside, a victim's vagina or anus is *not* evidence of penetration," *People v. Spicer*, 379 Ill. App. 3d 441, 457 n.9 (2007), held no such thing. In *Spicer*, the State's DNA expert testified that a "semen stain" was found on the victim's nightgown and housecoat, but her vaginal, oral, and rectal swabs did not contain semen. *Id.* at 447. In a footnote, this court noted, "The semen found on the victim's housecoat is not evidence of penetration." *Id.* at 457 n.9. Contrary to defendant's assertion in his brief, *Spicer* did not hold that semen must be found "inside" a victim's vagina or anus to constitute evidence of penetration.

¶ 71     We also reject defendant's argument that, because his semen could have arrived at N.M.'s anus in "endless ways," the trial court's conclusion that the transfer occurred via actual contact between his penis and her anus was pure speculation. On cross-examination, the State's expert in forensic DNA analysis agreed that semen could have been transferred through N.M. wearing underwear, by someone ejaculating on the area, or from semen "leaking" from a different area of her body. However, a "trier of fact is not required to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 229 (2009). The State is not required to disprove or rule out all possible factual scenarios and, merely because a hypothetical factual scenario is possible, it does not mean that a trier of fact cannot rely on reasonable inferences that flow from the evidence. *People v. Newton*, 2018 IL 122958, ¶ 27. Rather, as discussed above, the trial court could draw a reasonable inference from the DNA evidence that there was contact, however slight, between defendant's penis and N.M.'s anus. We find that this evidence was sufficient to establish the element of penetration.

¶ 72                                    2. *Unable to Consent*

¶ 73    Defendant next contends that the State failed to prove that he knew N.M. was unable to

consent. He asserts that N.M.'s testimony that she was intoxicated when she entered her apartment

and vomited multiple times "is not supported." He notes that although N.M. confirmed at trial that

her roommate, Korbackova, would have helped her if she ever appeared to be in danger, she also

testified that Korbackova did not stop him and N.M. when they entered the apartment and instead

left them alone. He asserts that this circumstance contradicts N.M.'s claimed level of insobriety

and appearance. Defendant further argues that Wedge's testimony exaggerated N.M.'s intoxication

level and is belied both by his failure to provide a description of N.M.'s incapacity to investigators

prior to his testimony and by the circumstance that N.M. gave her address to the person who drove

her home.

¶ 74    Defendant also maintains that the trial court's reliance on N.M.'s testimony about the

ferociousness and persistence of her vomiting bouts was unreasonable where no other witness

testified to seeing her vomit, the State did not introduce photographs of her vomit, and Busta did

not describe N.M.'s clothes as having vomit on them. Finally, defendant argues that "it defies all

logic" that, if he had known N.M. was unable to consent, he would have remained in a bed in

which she threw up until she woke, given her his real name and number, and said goodbye.

¶ 75    As noted above, in the context of criminal sexual assault, "consent" refers to the victim's

"freely given agreement to the act of sexual penetration or sexual conduct in question." 720 ILCS

5/11-0.1 (West 2012).[2] An otherwise competent person may be found to be unable to consent

---

[2] At the time of the offense in 2012, the Criminal Code of 2012 (Code) did not include a definition of the term "unable to give knowing consent." See 720 ILCS 5/11-0.1 (West 2012). In 2023, the legislature amended the Code to define "unable to give knowing consent" as including "when the victim has taken an intoxicating substance or any controlled substance causing the victim to become unconscious of the nature

because she is unconscious, asleep, or severely intoxicated. See *People v. Vaughn*, 2011 IL App (1st) 092834, ¶ 37; *People v. Fisher*, 281 Ill. App. 3d 395, 403 (1996).

¶ 76 "Knowledge of a material fact includes awareness of the substantial probability that the fact exists." 720 ILCS 5/4-5 (West 2012). Whether a person acted with knowledge may be inferred from circumstantial evidence. *People v. White*, 2016 IL App (2d) 140479, ¶ 37. "Circumstantial evidence is proof of certain facts and circumstances from which the trier of fact may infer other connected facts that human experience dictates usually and reasonably follow." *Id.* Inferences as to the mental state of a defendant are a matter particularly within the province of the trier of fact. *People v. Doolan*, 2016 IL App (1st) 141780, ¶ 52. The only limitation on the use of circumstantial evidence is that the inferences drawn from the evidence must be reasonable. *In re Gregory G.*, 396 Ill. App. 3d 923, 929 (2009).

¶ 77 In determining whether a defendant had knowledge that the victim was unable to give knowing consent to sexual contact, "the focus is on what the defendant knew or reasonably should have known regarding the victim's willingness or ability to give knowing consent." *People v. Roldan*, 2015 IL App (1st) 131962, ¶ 19. It follows that, if the defendant had reason to believe the victim was unable to give consent, he should have "abstain[ed] from engaging in any sexual contact with the victim." *Id.*

¶ 78 After reviewing the record, we find that the trial court could reasonably infer from the direct and circumstantial evidence presented at trial that defendant knew or should have known that N.M. was incapable of giving knowing consent to sexual acts. N.M. testified that about 30

---

of the act, and this condition was known or reasonably should have been known by the accused." See Pub. Act 102-1096, § 5 (eff. Jan. 1, 2023) (amending 720 ILCS 5/11-0.1).

minutes to an hour after having a second drink at Berlin, she began to feel like she never had before or since. She described the sensation as "almost *** like you can't feel your body," and stated she was confused and unsure of whom she was with and where she was going. Wedge testified that N.M. was heavily intoxicated before she left the nightclub. He stated that her speech was slurred, her eyes "were starting to go," and she looked "mopey." Then, outside Berlin, he saw her lying across the back seat of a car being driven by "Angel," "completely out of it," with her eyes rolled back and "slobbering" from the side of her mouth. See *People v. Rossato*, 2022 IL App (2d) 210698-U, ¶ 52 (in affirming the defendant's conviction for criminal sexual assault, finding that a defendant seeing an individual being helped walk up stairs and being put to bed in an intoxicated condition "would certainly have shown him that she was unable to knowingly consent to sex"); Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023) (nonprecedential orders entered on or after January 1, 2021, may be cited for persuasive purposes).

¶ 79    In addition, N.M. testified that she did not remember entering the car, was "in and out" during the ride to her home with defendant, and, once there, stumbled inside with her clothes in disarray. The next thing she remembered was waking to defendant rubbing his penis on her thigh and telling him to stop because she was very sick. Although she was not sure if she vomited before that point, she testified to vomiting and dry-heaving repeatedly through the night. See *Hills*, 2021 IL App (4th) 200220-U, ¶ 34 (in affirming the defendant's conviction for criminal sexual assault, finding that, where an individual is unable to walk as a result of her intoxication, it "would be obvious" to a defendant that she is also unable to give knowing consent to sexual activity); Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023) (nonprecedential orders entered on or after January 1, 2021, may be cited for persuasive purposes).

¶ 80    Viewing the evidence in the light most favorable to the prosecution, as we must, we conclude that a reasonable fact-finder could find, based on N.M.'s and Wedge's testimony, not only that N.M. was severely intoxicated, but also that defendant had ample opportunity to observe her condition and thus was aware of her inability to give consent to sexual activity due to her impairment. Although defendant urges us to discredit N.M.'s and Wedge's testimony regarding N.M.'s level of intoxication and illness, it is the responsibility of the trier of fact to determine the credibility of the witnesses and the weight to be given their testimony. *Gray*, 2017 IL 120958, ¶ 35. The trial court specifically found N.M. to be a credible witness and stated it found Wedge's testimony to be relevant regarding N.M.'s severe impaired condition at the time she left Berlin. We will not substitute our judgment for that of the trial court regarding issues of credibility. See *id.*

¶ 81                              B. Admission of Other-Crimes Evidence

¶ 82    Defendant's final contention on appeal is that the trial court abused its discretion in granting the State's motion to admit other-crimes evidence. He argues that the trial court did not engage in even a "cursory assessment" of the other-crimes evidence. He asserts that the court's failure to explain its ruling on the record or in a written order is, by itself, reason to reverse and remand for a new trial as, without the benefit of a record, this court should not assume that the trial court cautiously considered and meaningfully assessed the probative value of the evidence against its prejudicial impact. With regard to L.B.'s allegations specifically, defendant argues that they should not have been admitted because they were not proximate in time to the charged offenses, did not share any degree of factual similarity, and were unproven at the time of admission.

¶ 83    "Other-crimes evidence" refers to misconduct or criminal acts of the defendant that occurred before or after the charged conduct, including acts of misconduct for which the defendant was not charged or convicted. *People v. Sims*, 2019 IL App (3d) 170417, ¶ 28. Evidence of other crimes may be admissible to show a defendant's intent, *modus operandi*, identity, motive, or absence of mistake but, in general, inadmissible to show a defendant's criminal propensity. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003); see also Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). A "[d]efendant is entitled to have his guilt or innocence evaluated solely on the basis of the charged crime" and evidence of propensity to commit the charged offense raises the risk that a fact finder will convict a defendant because he is a "bad person deserving punishment." *Donoho*, 204 Ill. 2d at 170.

¶ 84    However, section 115-7.3 of the Code, which applies to certain enumerated sex offenses, including criminal sexual assault, allows evidence of the defendant's commission of another of the listed offenses to be admissible for "any matter to which it is relevant." 725 ILCS 5/115-7.3(a)(1), (b) (West 2018). "Any matter" specifically includes a defendant's propensity to commit sex offenses. *Donoho*, 204 Ill. 2d at 176; *People v. Adams*, 2023 IL App (2d) 220061, ¶ 69. This court has recognized that, in enacting section 115-7.3, the legislature intended to single out sex offenders in recognition of their propensity to repeat sex offenses. *Adams*, 2023 IL App (2d) 220061, ¶ 68 (citing *People v. Childress*, 338 Ill. App. 3d 540, 549 (2003)).

¶ 85    Even if the State offers other-crimes evidence for a permissible purpose, the evidence may nevertheless be precluded if its prejudicial effect substantially outweighs its probative value. *People v. Bochenek*, 2020 IL App (2d) 170545, ¶ 56; see also 725 ILCS 5/115-7.3(c) (West 2018). In weighing the probative value against undue prejudice, the statute provides that a court may

consider the proximity in time to the charged offense, the degree of factual similarity, or other relevant facts or circumstances. 725 ILCS 5/115-7.3(c) (West 2018). While other-crimes evidence must have some threshold similarity to the charged offense, "[w]here such evidence is not being offered under the *modus operandi* exception, 'mere general areas of similarity will suffice' to support admissibility." *Donoho*, 204 Ill. 2d at 184 (quoting *People v. Illgen*, 145 Ill. 2d 353, 372-73 (1991)). Whether to admit other-crimes evidence is a decision that rests in the sound discretion of the trial court. *Bochenek*, 2020 IL App (2d) 170545, ¶ 56. An abuse of discretion occurs where the trial court's determination is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *Donoho*, 204 Ill. 2d at 182.

¶ 86    Here, we find that the trial court did not commit an abuse of discretion in admitting L.B.'s testimony. We agree with the court that "enough similarity" existed between N.M.'s and L.B.'s experiences to support admission of the other-crimes evidence. Both N.M. and L.B. were young women who had been drinking at a bar in Chicago, and both consumed drinks that they did not receive directly from a bartender. Both women reported feeling a level of impairment they had never experienced before or after the nights they were assaulted, including not being able to remember complete series of events. Both N.M. and L.B. described having disjointed or absent memories of leaving the respective bars they had been patronizing and of being driven or walking home. Defendant assaulted both women after they had showed outward signs of significant impairment; among other things, N.M. was lying down and "slobbering" in a car and then stumbled into her home, and L.B. was unable to work a swipe card to unlock her dormitory building's entry door. Following the assaults, both women experienced prolonged bouts of repeated vomiting.

¶ 87    We are aware that several differences exist between the two offenses, including, as defendant notes in his brief, that L.B. was assaulted outside by a person she had no recollection of seeing before, while N.M. spent a portion of her evening interacting with defendant at Berlin before their sexual encounter inside her home. However, the existence of some differences between offenses does not defeat admissibility, as no two independent crimes are identical. *Donoho*, 204 Ill. 2d at 185. Moreover, the trial court did not admit evidence of L.B.'s case for purposes of showing *modus operandi*. As such, "general areas of similarity" between the incidents were sufficient to support admission. *Id.* at 184. Given the similarities between N.M.'s and L.B.'s experiences, we cannot say it was unreasonable, fanciful, or arbitrary for the trial court to determine that the probative value of the other-crimes evidence substantially outweighed its prejudicial effect. See *id.* at 182. Therefore, we find no abuse of discretion.

¶ 88    As a final matter, we address defendant's assertion that the trial court did not engage in even a "cursory assessment" of the other-crimes evidence, and that its "failure to explain its ruling on the record or in a written order is by itself a reason to reverse this matter and grant [defendant] a new trial." In making this argument, defendant relies on the following exhortation made by our supreme court in *Donoho*, 204 Ill. 2d at 186: "[W]e urge trial judges to be cautious in considering the admissibility of other-crimes evidence to show propensity by engaging in a meaningful assessment of the probative value versus the prejudicial impact of the evidence."

¶ 89    Contrary to defendant's argument, we find that the record shows the trial court in this case weighed the probative value of the other-crimes evidence against the prejudicial effect. The trial court noted that there were "issues" with the three other-crimes cases offered by the State and ultimately found the other-crimes evidence in L.B.'s case and one other case (which the State did

not present at trial) bore "enough similarity" to N.M.'s case for admission for purposes other than to show *modus operandi*. Having made that finding, the trial court concluded that admission of L.B.'s evidence would be "way more probative rather than it is prejudicial to the defendant in this case."

¶ 90    While the trial court was not as verbose in its explanation as defendant wishes, the record nevertheless reveals that the court was not only aware of its duty to weigh the probative value against the prejudicial impact of the other-crimes evidence, but actually conducted that balancing test. See *People v. Adams*, 2023 IL App (2d) 220061, ¶ 72 (finding error where the trial court failed to make any reference to balancing the probative value and the prejudicial effect of other-crimes evidence offered pursuant to section 115-7.3). Accordingly, defendant's argument fails.

¶ 91                                    III. CONCLUSION

¶ 92    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 93    Affirmed.